Kelly SMITH and Osagie Latif Ighile, Plaintiffs,

v.

IMMIGRATION AND NATURALIZATION SERVICE et al., Defendants.

Civ. A. No. 87–1988–C.

United States District Court, D. Massachusetts.

April 11, 1988.

---

William Southard, Neal Rosen, Bingham, Dana & Gould, Marjorie Heins, Massachusetts Civ. Liberties, Nelson Brill, Boston, Mass., for plaintiffs.

Martha Sosman, Asst. U.S. Atty., Boston, Mass., for defendants.

## MEMORANDUM

CAFFREY, Senior District Judge.

The controversy before the Court involves the constitutional validity of Section 5 of the Immigration Marriage Fraud

Amendments of 1986, Pub.L. 99–639, now codified as 8 U.S.C. §§ 1154(h) and 1255(e). Both parties have moved for summary judgment. For the reasons stated below, the Court holds that the amendments do not offend the due process clause of the Fifth Amendment. Summary judgment is therefore granted in favor of the defendants.

### I. Background

Under federal law, "immediate relatives" of United States citizens are exempt from the quota restrictions set by the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, and thereby granted permanent resident status ahead of the thousands of immigrants who seek to make their homes in the United States. 8 U.S.C. § 1151(b). The statutory definition of "immediate relative" includes the spouse of a United States citizen. Accordingly, marriage to a citizen allows an alien to avoid the lengthy wait imposed on other immigrants seeking entrance into this country. Understandably, this preferential treatment provides a strong incentive for aliens to enter into marriages with citizens for no other purpose than to gain immigration benefits.

To alleviate the incentive to enter into sham marriages, Congress enacted the Marriage Fraud Amendments of 1986. Prior to the amendments, when a citizen petitioned for an adjustment of status for an alien spouse, the Immigration and Naturalization Service ("INS") conducted an inquiry into each petition to determine whether the marriage was bona fide or merely a sham entered into for the purpose of obtaining immigration benefits. If the INS concluded that the marriage was sincere, it granted the alien spouse permanent resident status. Obviously, no adjustment was granted if the marriage was determined to be a fraud.

The Marriage Fraud Amendments were designed to tighten the statutory scheme in order to prevent marriage fraud. Under the amendments, an alien who marries a citizen receives only a conditional adjustment of status based on the fact of the marriage. 8 U.S.C. § 1186a(a)(1). Conditional status is granted only after the INS conducts an inquiry into the sincerity of the marriage. The alien's immigration status remains conditional for a two year period, after which, if the marriage is in fact bona fide, the condition is removed and the alien spouse obtains permanent resident status. 8 U.S.C. § 1186a(c)(3)(B).

If, at the time of the marriage, the alien is involved in deportation or exclusion proceedings, the procedures prescribed by the amendments are very different. When an alien who is involved in such proceedings marries a citizen, the alien spouse is required to leave the United States for a two year period before he or she may obtain an adjustment of status based on the marriage. 8 U.S.C. §§ 1154(h) and 1255(e). The two year non-residency requirement is applied whether or not the alien/citizen marriage is in fact bona fide or a sham. The INS conducts no individual inquiry into the bona fides of the marriage until the two year non-residency period is completed. It is these latter provisions of the amendments which are at issue in the present action.[1]

The plaintiffs are a married couple currently residing in Boston. Plaintiff Kelly Smith is a United States citizen. Her husband, Osagie Latif Ighile, is a citizen of Nigeria who, although lawfully admitted to the United States as an initial matter, has been residing here continuously and illegally since 1982. The plaintiffs' marriage took place in 1986, at a time when Mr. Ighile was already involved in deportation proceedings. Consistent with the statutory requirements described above, Mr. Ighile was informed he would have to leave the country for two years before a petition for permanent resident status based on the marriage would be considered. He was also granted a date for voluntary departure from the United States. Prior to that date,

---

**1.** The Marriage Fraud Amendments also increase the criminal penalties for marriage fraud, permanently bar from the United States any alien who attempts to gain any immigration benefit from a fraudulent marriage and makes marriage fraud grounds to exclude an alien from the United States.

the plaintiffs filed this action claiming that the two year non-residency requirement violates their rights to due process and equal protection under the Fifth Amendment.

## II. The Equal Protection Claim

■ The plaintiffs claim that the statutory distinction between aliens who marry citizens while involved in deportation proceedings and other aliens who marry citizens denies them the equal protection of the laws guaranteed by the Constitution. Although the plaintiffs argue that Section 5 fails to pass muster under even the most minimal standard of equal protection analysis, the parties are in dispute over the appropriate standard of review for this legislation. The plaintiffs contend that because the statute burdens their fundamental right to marry, it should be closely scrutinized to determine whether the burden imposed on the plaintiffs, and not other alien/citizen couples, is justified by an important governmental interest and whether the means chosen to achieve the government's interest bear a substantial relationship to that end.

There can be no doubt that the statutory scheme at issue here imposes a substantial burden on the marital relationship between the plaintiffs, a burden not imposed on citizen/alien couples who marry before commencement of deportation proceedings against the alien spouse. Before Mr. Ighile can obtain lawful residency in this country, he is required to leave his home and his spouse for a period of two years. That this separation may be avoided by Ms. Smith simply accompanying her husband out of the country does not alleviate the burdens imposed by this statute. Ms. Smith is caught between the proverbial "rock and a hard place"—she must either give up her husband for two years or take leave of her work, her family and her culture.

Ordinarily, a statute which imposes such a heavy burden on the marital relationship would be subject to searching judicial review in order to determine whether it is carefully crafted to achieve important governmental goals. *Zablocki v. Redhail,* 434 U.S. 374, 383, 98 S.Ct. 673, 679, 54 L.Ed.2d 618 (1978). The right to marry has been deemed of fundamental importance in our country and matters relating to marriage and family are accorded special protection under our constitutional scheme. *Id.* at 383–385, 98 S.Ct. at 679–680. *See also Griswold v. Connecticut,* 381 U.S. 479, 486, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974).

Although marriage is recognized as one of the fundamental rights protected by the Constitution, the statute at issue here involves an exercise of congressional power in the area of immigration and naturalization. The extraordinarily broad power of Congress over immigration matters is well established. It has long been recognized that the power to expel or exclude aliens is a "fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy v. Mezei,* 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953). In the area of immigration, Congress has the power to make substantive policy choices that would be totally unacceptable under the Constitution if imposed by the states or if imposed on citizens. *Mathews v. Diaz,* 426 U.S. 67, 79–80, 96 S.Ct. 1883, 1891, 48 L.Ed.2d 478 (1976).

To be sure, an exercise of Congressional power in the area of immigration is not completely immune from judicial scrutiny. When Congress creates distinctions between classes of aliens, those distinctions must be supported by a rational basis. *Sadegh–Nobari v. INS,* 676 F.2d 1348, 1351 (10th Cir.1982); *Narenji v. Civiletti,* 617 F.2d 745, 747 (D.C.Cir.1979); *Guan Chow Tok v. INS,* 538 F.2d 36, 38 (2d Cir.1976); *Newton v. INS,* 736 F.2d 336, 339 (6th Cir.1984). However, the role of the courts in analyzing an equal protection challenge to a federal immigration statute is limited to determining whether the statute at issue is conceivably related to the achievement of a legitimate federal interest. "[I]t is not the judicial role in cases of this sort to probe and test the justifications for the legislative decision." *Fiallo v. Bell,* 430

U.S. 787, 799, 97 S.Ct. 1473, 1481, 52 L.Ed. 2d 50 (1977).

The plaintiffs contend that congressional power in the immigration field is more circumscribed when a challenged regulation involves deportation of a lawfully admitted alien rather than exclusion of an alien who has not yet been admitted. According to the plaintiffs' view, an alien who successfully gains admission to this country obtains greater constitutional protection than an alien who is never lawfully admitted to the United States. For that reason, the plaintiffs would have the Court employ a more exacting standard to review the challenged legislation.

■ Although it is true that lawfully admitted aliens obtain some rights not accorded to aliens who have never been admitted, none of the authorities cited by the plaintiffs persuade the Court that the appropriate standard of review for this statute is affected by the fact that Mr. Ighile was lawfully admitted to this country as an initial matter. The principal case relied on by the plaintiffs, *Landon v. Plasencia,* 459 U.S. 21, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982), does not authorize greater judicial review of congressional policy choices in the field of immigration solely because the aliens affected by the choices are deportable rather than excludable. To the contrary, *Landon* simply recognizes that a resident alien is entitled to fair procedures before he or she can be expelled or excluded from this country. *Landon* does not purport to allow courts to substitute their judgments as to who may remain in this country and who must leave for the decisions laid down by Congress. 459 U.S. at 34–35, 103 S.Ct. at 330–331.

■ Nor does the fact that this statute impinges on the marital relationship mandate a higher standard of review than is normally employed in analyzing constitutional challenges to immigration statutes. In *Fiallo v. Bell,* 430 U.S. at 787, 97 S.Ct. at 1473, the Supreme Court specifically rejected a claim that an immigration statute should be subjected to more rigorous scrutiny than normally applied to such legislation because the statute impinged on the family relationship. Indeed, in *Fiallo,* the Court applied a rational basis analysis even though the statute at issue in that case drew distinctions based on sex and illegitimacy, classifications normally associated with a stricter standard of review. *Id.* Although the plaintiffs attempt to distinguish *Fiallo* on the grounds that the case involved exclusion of aliens as an initial matter rather than deportation, *Fiallo* implies no such distinction and this Court can find no sound basis for supplying it.

■ Turning to the challenged statute, this Court rules that the distinction drawn by the Marriage Fraud Amendments between aliens who marry while involved in deportation proceedings and other alien spouses is rationally related to a legitimate governmental interest. It cannot be denied that Congress has a strong and legitimate interest in deterring marriages which are entered into solely for the purpose of obtaining immigration benefits. Nor is it illogical to assume that aliens who are engaged in deportation proceedings are more likely than other aliens to enter into fraudulent marriages in order to avoid being expelled from the country. In many instances, these aliens will have no valid defense to deportation and marriage to an American citizen may be their only hope for remaining in this country. The amendments are designed to deter marriage fraud in this susceptible group by removing the incentive to engage in a fraudulent marriage. Since marriage to a United States citizen will no longer allow an alien engaged in deportation proceedings to remain in this country, it is rational to conclude that the two year non-residency requirement will have some effect in reducing the incidence of marriage fraud within this high-risk group.

## III. The Due Process Claims

The plaintiffs also challenge the Marriage Fraud Amendments on both procedural and substantive due process grounds. These claims are nearly indistinguishable and, in substance, assert that due process requires that the plaintiffs be afforded an opportunity to prove the sincerity of their

marriage before they may be denied immigration benefits available to others.

### A. Procedural Due Process

■ It is elementary that the government must provide appropriate procedural safeguards before it may deprive a citizen or an alien of life, liberty or property. *Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Before the right to due process attaches, however, a party seeking relief must show that he or she has an interest which is comprehended within the meaning of life, liberty or property. *Paul v. Davis,* 424 U.S. 693, 710, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976). The interest protected may be derived from the Constitution or it may be created by statute. Absent a protected interest, however, procedural due process guarantees do not attach regardless of the effect of governmental action on the aggrieved parties.

The plaintiffs have pointed to no interest which is created by either the Constitution or statute that would entitle them to a hearing on a procedural due process theory. Although the plaintiffs point out that the statute imposes burdens on their marital relationship, the constitutionally recognized liberty interest in marriage does not encompass the right to have one's alien spouse remain in this county.[2] *Burrafato v. U.S. Dept. of State,* 523 F.2d 554, 555 (2d Cir.1975), *cert. denied,* 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 313 (1976); *Silverman v. Rogers,* 437 F.2d 102, 107 (1st Cir. 1970), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1667, 29 L.Ed.2d 149 (1971). Nor is any interest created by statute—the statute at issue in this case specifically denies the immigration benefits that the plaintiffs seek to acquire.

Perhaps in recognition that they are on tenuous grounds in asserting a liberty or property interest protected by the Constitution, the plaintiffs argue that Section 5 of the Marriage Fraud Amendments amounts to a legislative fact-finding that their marriage is a fraud. In essence, the plaintiffs claim that the legislation establishes as fact that all aliens who marry during deportation proceedings are merely attempting to obtain immigration benefits. The plaintiffs argue that this fact cannot be established against them consistently with procedural due process without first allowing them an opportunity to present evidence to the contrary.

The Court rejects plaintiffs' sugestion that the Marriage Fraud Amendments constitute any sort of legislative determination or pronouncement that their marriage is a sham. To the contrary, the amendments render the issue of sincerity irrelevant altogether on the question of whether Mr. Ighile may lawfully remain in this country. Certainly, if Congress had chosen to condition Mr. Ighile's eligibility for a status adjustment on the existence of a bona fide marriage, procedural due process would require that the couple be given a fair opportunity to establish that fact before an adjustment could be denied. *See, e.g., Ali v. INS,* 661 F.Supp. 1234, 1246 n. 6 (D.Mass. 1986); *Stokes v. United States,* 393 F.Supp. 24, 29 (S.D.N.Y.1975). Under the statutory scheme as amended, however, Mr. Ighile and others like him must reside outside of the United States for the two year period whether their marriages are grounded on the best of intentions or the basest of motives.[3] Thus, Congress has opted to deny eligibility for the benefit altogether for a two year period without reference to the validity of the plaintiffs' marriage. Such a choice is constitutional unless it violates the substantive right of the plaintiffs.

### B. Substantive Due Process

■ The plaintiffs next argue that the statute operates as a conclusive presumption that their marriage is fraudulent and

---

**2.** Obviously, an alien cannot claim a constitutional right to remain in this country because of the existence of a marital relationship with a citizen. *Ansong v. District Director,* 596 F.Supp. 882, 888 (D.Me.1984).

**3.** The plaintiffs will have an opportunity to establish the validity of their marriage at the end of the two year period and presumably, the INS will afford whatever procedural safeguards are required at that time.

that such presumptions are unconstitutional unless the plaintiffs are given an opportunity to rebut the inference of fraud. The Court perceives no difference between this argument and the plaintiffs' earlier assertion that the statute constitutes a legislative determination that all marriages within the plaintiffs' class are a sham. Nonetheless, the plaintiffs' memoranda indicate that they are relying on substantive, rather than procedural, due process grounds in offering this challenge; therefore, the Court will consider whether the statute offends the substantive guarantees of the due process clause.

The plaintiffs rely primarily on the decision in *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), for the proposition that the government may not establish presumptions which severely burden fundamental rights without affording the affected parties an opportunity to rebut the premise underlying the presumption. *See also Vlandis v. Kline,* 412 U.S. 441, 446, 93 S.Ct. 2230, 2233, 37 L.Ed.2d 63 (1973); *Stanley v. Illinois,* 405 U.S. 645, 656–57, 92 S.Ct. 1208, 1215–16, 31 L.Ed.2d 551 (1972). In *LaFleur,* the Supreme Court invalidated maternity leave regulations which presumed that a woman who was more than five months pregnant was no longer fit to teach. 414 U.S. at 648, 94 S.Ct. at 800. The court ruled that the regulation was overbroad in accomplishing its stated purpose of ensuring that teachers were fit to perform their jobs because many of the teachers to whom it applied were physically able to continue teaching. *Id.* at 646, 94 S.Ct. at 799. This overbreadth was fatal because of the burdens the regulation imposed on a woman's freedom of choice in matters relating to family and marriage. *Id.* at 648, 94 S.Ct. at 800.

Although Section 5 undoubtedly affects many marriages which were not entered into for fraudulent purposes, the Court declines plaintiffs' invitation to apply the reasoning of *LaFleur* and invalidate Section 5 on substantive due process grounds. Although Section 5 burdens the plaintiffs' marital relationship, it has already been noted that the constitutional protection or-dinarily afforded the marital relationship is more limited when Congress seeks to exercise its plenary power over immigration matters. For this reason, the Court rules that the validity of Section 5 is more appropriately measured by the standard set forth in *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975).

In *Salfi,* the court upheld a provision of the Social Security Act which, much like Section 5, sought to discourage marriage fraud for the purpose of obtaining benefits and which did not provide for individual hearings into the validity of the affected marriages. The Court stated:

> ... the question raised is not whether a statutory provision precisely filters out those, and only those, who are in the factual position which generated the congressional concern reflected in the statute. Such a rule would ban all prophylactic provisions ... Nor is the question whether the provision filters out a substantial part of the class which caused congressional concern, or whether it filters out more members of the class than nonmembers. The question is whether Congress, its concern having been reasonably raised by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule.

*Id.* at 777, 95 S.Ct. at 2472.

The Court has already noted that Congress could rationally believe that the incidence of marriage fraud is higher among those aliens who are faced with imminent deportation that those who are not. So too, Congress could reasonably conclude that the greater risk of marriage fraud among this group justified foregoing the usual procedure of investigating marriages on an individual basis and imposing a deterrent not applied to other alien/citizen marriages. Congress could believe that "the very possibility of prevailing at a hearing could reasonably be expected to encourage

sham relationships." *Weinberger v. Salfi,* 422 U.S. at 783, 95 S.Ct. at 2475. It is not wholly irrational for Congress to remove this incentive by eliminating individual inquiries into the marriages of persons who are most likely to engage in the prohibited practice. To hold otherwise would be to destroy the very purpose of Section 5.

Order accordingly.