**Laura Staples ESCOBAR and Moises Escobar, Plaintiffs,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, et al., Defendants.**

**Civ. A. No. 88–0730.**

United States District Court,
District of Columbia.

Dec. 9, 1988.

James A. Treanor, David E. Mills, Elizabeth J. Gustafson, Dow, Lohnes & Albertson, Washington, D.C., for plaintiffs.

Jay B. Stephens, John D. Bates, Curtis E. Hall, Office of the U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

THOMAS F. HOGAN, District Judge.

This is a challenge to the constitutionality of Section 5 of the so-called "Immigration Marriage Fraud Amendments of 1986," 8 U.S.C. §§ 1154(h), 1255(e) (Supp. IV 1986) ("Section 5"). The case is presently before the Court on defendants' Motion to Dismiss and plaintiffs' Motion for Summary Judgment. The Court heard argument on the motions on October 14, 1988. Although the Court sympathizes with plaintiffs' plight, for the reasons set forth below, the Court shall grant defendants' Motion to Dismiss and deny plaintiffs' Motion for Summary Judgment.

## I. FACTS

Moises Escobar, a citizen of El Salvador, entered the United States illegally on September 22, 1984. He was apprehended that same day and ordered to show cause why he should not be deported. He admitted deportability and filed an application for political asylum on November 2, 1984. On November 9, 1984, he was permitted to travel to Washington, D.C., where his mother, sister and two brothers reside. At the end of September, 1984, he moved to Hyattsville, Maryland. He has worked continuously since 1984, first as a baker and then at his present job with the Church of Jesus Christ of Latter-day Saints, beginning in January, 1987. It was through the Mormon Church that he met his wife to-be in February, 1987.

Laura Staples Escobar is a United States citizen. She was born in Mexico and speaks Spanish fluently. She is also a member and employee of the Mormon Church. After she met Mr. Escobar, the couple became engaged and were interviewed by officials of the Mormon Church in connection with their desire to be married in the Mormon Temple, a privilege

granted only to those whom Church officials recommend. With the blessing of the Church, the Escobars were indeed married in the Mormon Temple on June 13, 1987.

On June 29, 1987, Mrs. Escobar filed a marriage petition with the Immigration and Naturalization Service ("INS") requesting that her husband be classified as an "immediate relative." On September 30, 1987, Mr. Escobar withdrew his request for political asylum and was granted a voluntary departure order requiring him to leave the United States by March 30, 1988, later extended to June 25, 1988, with a request for a further extension currently pending.

Because deportation proceedings were pending against Mr. Escobar at the time of his marriage, Section 5 precluded INS from granting the marriage petition to classify him as an immediate relative until after he has left the country for two years. Faced with this forced exile, the Escobars filed this suit on March 17, 1988, challenging the constitutionality of Section 5.

## II. THE IMMIGRATION MARRIAGE FRAUD AMENDMENTS OF 1986

"Immediate relatives," including spouses, of United States citizens are exempt from the numerical quotas for immigrants set by the Immigration and Naturalization Act. *See* 8 U.S.C. § 1151 (1982). As the title suggests, the Immigration Marriage Fraud Amendments of 1986 were enacted to counter the problem of "sham" marriages, or marriages entered solely for the purpose of circumventing the immigration laws. *See generally Fraudulent Marriage and Fiance Arrangements to Obtain Permanent Resident Immigration Status: Hearing Before the Subcomm. on Immigration and Refugee Policy of the Senate Comm. on the Judiciary,* 99th Cong., 1st Sess. (1985). As Representative Mazzoli explained in introducing the legislation to the House, it

addresses the problem of marriage fraud. Because spouses of U.S. citizens are—and I think quite rightly—given special consideration under our immigration laws, many aliens who would not otherwise be allowed to live in the United

States find it expedient to enter into a fraudulent marriage.

132 Cong.Rec. H8587 (daily ed. Sept. 29, 1986) (statement of Rep. Mazzoli).

Section 5, entitled "Two-year waiting period before granting immediate relative status," provides that "a petition may not be approved to grant an alien immediate relative status or preference status by reason of a marriage which was entered into during the period described in section 245(e)(2), until the alien has resided outside the United States for a 2–year period beginning after the date of the marriage." 8 U.S.C. § 1154(h). The cross-referenced section, 245(e)(2), in turn, defines the relevant period as that "during which administrative or judicial proceedings are pending regarding the alien's right to enter or remain in the United States." *Id.* at § 1255(e)(2). Nor may "[a]n alien who is seeking to receive an immigrant visa on the basis of a marriage which was entered into during the period described" have his or her status adjusted. *Id.* at § 1255(e)(1).

If the marriage was entered before this period, however, Section 2 applies. Under that section, a marriage petition may be considered without the two-year waiting period abroad, and the alien spouse may be granted "conditional permanent resident status." *Id.* at § 1186a(a). The conditional permanent resident status lasts for a probationary two-year period and is subject to revocation if it is shown by a preponderance of the evidence that the marriage "was entered into for the purpose of procuring an alien's entry as an immigrant"; or "has been judicially annulled or terminated, other than through the death of a spouse"; or that "a fee or other consideration was given" for filing the marriage petition. *Id.* at § 1186a(b)(1). Finally, within ninety days before the second anniversary, or later if good cause is shown, the couple must jointly file a petition and appear for a personal interview in order to remove the alien spouse's conditional status and obtain final permanent resident status. *Id.* at § 1186a(c).

The net result of these provisions is that the timing of the marriage determines

whether INS will entertain a marriage petition and provide the parties with an opportunity to establish the bona fides of their relationship. If the marriage occurs after deportation proceedings have been initiated, the INS will not do so until the alien spouse has left the United States for two years.

Plaintiffs challenge Section 5 on substantive and procedural due process and equal protection grounds. Specifically, the Escobars' complaint asserts that Section 5 1) imposes a substantial burden on their fundamental right to marry; 2) creates an irrebuttable presumption of fraud; and 3) establishes an irrational classification between those marriage petitioners who file before and those who file after deportation proceedings are initiated.

## III. DISCUSSION

Three federal district courts have already rejected constitutional challenges to Section 5 in analogous cases. *Smith v. I.N.S.*, 684 F.Supp. 1113 (D.Mass.1988); *Anetekhai v. I.N.S.*, 685 F.Supp. 599 (E.D.La. 1988); *Almario v. I.N.S.*, No. 87–CV–73219 (E.D.Mich. Nov. 30, 1987) (unpublished bench opinion), *appeal docketed*, No. 88–1134 (6th Cir. Feb. 9, 1988) (set for oral argument Dec. 8, 1988). One district court, however, has recently declined to dismiss such a case. *Manwani v. I.N.S.*, No. C–C–88–41M (W.D.N.C. Sept. 22, 1988) (unpublished order denying INS's motion to dismiss). This Court agrees with *Smith* and *Anetekhai* that the United States Supreme Court's decision in *Fiallo v. Bell*, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), is controlling, notwithstanding plaintiffs' valiant efforts to distinguish the case.

*Fiallo* involved a constitutional challenge to another statutory limitation on petitions for immediate relative status. The provision challenged in that case denied immediate relative status to illegitimate alien children where the petitioner-citizen was the child's natural father, but allowed it where the petitioner-citizen was the child's natural mother. *Id.* at 788–90, 97 S.Ct. at 1476–77 (citing 8 U.S.C. §§ 1101(b)(1)(D), 1101(b)(2)).

Plaintiffs in *Fiallo* claimed the statutory provisions

(i) denied them equal protection by discriminating against natural fathers and their illegitimate children "... without either compelling or rational justification"; (ii) denied them due process of law to the extent that there was established "an unwarranted conclusive presumption of the absence of strong psychological and economic ties between natural fathers and their children born out of wedlock and not legitimated"; and (iii) "seriously burden[ed] and infring[ed] upon the rights of natural fathers and their children, born out of wedlock and not legitimated, to mutual association, to privacy, to establish a home, to raise natural children and to be raised by the natural father."

*Id.* at 791, 97 S.Ct. at 1477 (quoting complaint). Moreover, this equal protection, due process and familial rights challenge is virtually identical to that raised against Section 5 in the case at bar.

The Court in *Fiallo* began its analysis by stressing the very limited scope of judicial review of immigration legislation. *Id.* at 792, 97 S.Ct. at 1478. The Court repeated an oft-quoted statement that its cases " 'have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.' " *Id.* (quoting *Shaughnessy v. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953)). The present case must also be viewed in this highly deferential context.

A key premise in *Fiallo* was that the case did *not* involve the rights of the citizen-petitioners, but only the rights, if any, of the alien children. *Id.* 97 S.Ct. at 1479 n. 6. Indeed, this is the point that divided the majority from the dissent, as the dissent took the position that the case "unlike most immigration cases that come before the Court, directly involves the rights of citizens, not aliens." *Id.* 430 U.S. at 800, 97 S.Ct. at 1482 (Marshall, J. & Brennan, J., dissenting).

In an all-important footnote, the majority rejected this premise, concluding that

> [i]n the inevitable process of 'line drawing,' Congress has determined that certain classes of aliens are more likely than others to satisfy national objectives without undue cost, and it has granted preferential status only to those classes.... [and] *despite the impact of these classifications on the interests of those already within our borders, congressional determinations such as this one are subject only to limited judicial review.*

*Id.* at 795 n. 6, 97 S.Ct. at 1479 n. 6 (emphasis added). In light of this, the Court here must likewise conclude that only the rights of Moises Escobar are directly at issue in the present challenge to Section 5, though obviously this Court's decision will have a substantial impact on the interests of his American wife.

Her fundamental right to marry, *see Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978), does not alter the analysis, as the Court can discern no basis for giving this fundamental right any greater weight in this context than that given to the analogous familial rights asserted in *Fiallo.* Furthermore, as INS points out, it is well settled that a citizen spouse has no constitutional right to have his or her alien spouse enter or remain in the United States. *E.g., Burrafato v. United States Department of State,* 523 F.2d 554, 555 (2d Cir.1975) ("no constitutional right of a citizen spouse is violated by deportation of his or her alien spouse"), *cert. denied,* 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 313 (1976); *Silverman v. Rogers,* 437 F.2d 102, 107 (1st Cir.1970), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1667, 29 L.Ed. 2d 149 (1971); *Swartz v. Rogers,* 254 F.2d 338 (D.C.Cir.), *cert. denied,* 357 U.S. 928, 78 S.Ct. 1373, 2 L.Ed.2d 1362 (1958).

In accordance with *Fiallo,* therefore, Section 5 is subject only to minimum scrutiny to determine whether it has a rational basis. Indeed, the Court in *Fiallo* suggested that even hypothetical justifications were adequate, reasoning that "Congress *may well have* given substantial weight, in adopting the classification here challenged, to these problems of proof and the potential for fraudulent visa applications that would have resulted from a more generous drawing of the line." *Id.* 430 U.S. at 799 n. 8, 97 S.Ct. at 1481 n. 8 (emphasis added). Moreover, the rational basis test is one a statute rarely fails; and Section 5 certainly passes it. As the Court in *Smith* explained:

> It cannot be denied that Congress has a strong and legitimate interest in deterring marriages which are entered into solely for the purpose of obtaining immigration benefits. Nor is it illogical to assume that aliens who are engaged in deportation proceedings are more likely than other aliens to enter into fraudulent marriages in order to avoid being expelled from the country.

*Smith,* 684 F.Supp. at 1117. There is no colorable argument that Section 5 is irrational.

Plaintiffs attempt to distinguish *Fiallo* on the grounds that it deals with Congress's *substantive* immigration classifications, or policy judgments, and not the *procedural* aspects of executing that policy. In other words, plaintiffs argue that Section 5 sets up an unconstitutional procedure, *i.e.,* one based on an "irrebuttable presumption" that post-deportation proceeding marriages are fraudulent. In this vein, plaintiffs argue that *Landon v. Plasencia,* 459 U.S. 21, 103 S.Ct. 321, 74 L.Ed. 2d 21 (1982), should control rather than *Fiallo.*

*Plasencia* dealt with two questions: 1) whether a permanent resident alien attempting to re-enter the country was entitled to a full-scale "deportation" hearing, or merely an "exclusion" hearing under the relevant statute; and 2) whichever hearing was accorded, what process was then due? The first question was one of straight statutory interpretation, not relevant here. Plaintiffs rely principally on the Court's discussion of the second, procedural due process issue in *Plasencia,* based on the factors set forth in *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976). Even in *Plasencia,* however, the Court cautioned that "[t]he

role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause *and does not extend to imposing procedures that merely displace congressional choices of policy." Id.,* 459 U.S. at 34–35, 103 S.Ct. at 330–31.

Here Congress has made a policy decision in Section 5 to preclude consideration of marriage petitions for two years where the marriage takes place after deportation proceedings have been initiated. Thus, in the Court's view, while the line is not clear-cut, Section 5 partakes more of substantive "policy" than of "procedure." Plaintiffs' own arguments suggest this. That is, plaintiffs argue that Section 5, in effect, establishes an "irrebuttable presumption" that such a marriage is fraudulent; and presumptions have long been viewed as matters of substantive, not procedural law. *Cf. Dick v. New York Life Insurance Co.,* 359 U.S. 437, 446–47, 79 S.Ct. 921, 927, 3 L.Ed.2d 935 (1959) (presumption substantive law for purposes of *Erie* ).

This does *not* mean, of course, that plaintiffs have no right to due process under Section 5. The process which they are due, however, is limited to fair procedures in determining that Section 5 was properly triggered, *i.e.,* whether Mr. Escobar was married when he was subject to administrative or judicial proceedings regarding his right to enter or remain in the United States. 8 U.S.C. §§ 1154(h), 1255(e)(2). Moreover, there has been no suggestion that the procedures were inadequate in this case to determine if Section 5 was properly invoked. To require anything more would be to "displace congressional choices of policy" in Section 5.

## IV. CONCLUSION

In sum, while Section 5 is harsh, it is not unconstitutional. Accordingly, plaintiffs' challenge fails and this case must be dismissed.

## ORDER

In accordance with the foregoing memorandum opinion, and for the reasons set forth therein, it is this 9th day of December, 1988,

ORDERED that defendants' Motion to Dismiss shall be GRANTED and this case DISMISSED with prejudice.