**Jon BLACKWELL, Plaintiff,**

v.

**Richard THORNBURGH, et al., Defendants.**

**No. CV 89–1650–WMB.**

United States District Court, C.D. California.

Dec. 10, 1989.

Carl Shusterman, Barst & Mukamal, Los Angeles, Cal., for plaintiff.

George H. Wu, Asst. U.S. Atty., Los Angeles, Cal., for defendants.

## ORDER

WM. MATTHEW BYRNE, Jr., District Judge.

### I. INTRODUCTION

Plaintiff Jon Blackwell has filed this action for injunctive and declaratory relief challenging a regulation of the Immigration and Naturalization Service (INS), 8 C.F.R. § 204.1(a)(2)(C)(iii), and the constitutionality of certain portions of Section 5 of the Immigration Marriage Fraud Amendments of 1986, codified at 8 U.S.C. §§ 1154(h) and 1255(e). Defendants are the Attorney General, the Commissioner of the INS, and the INS District Director for Los Angeles. This matter is before the Court on defendants' motion to dismiss and plaintiff's cross-motion for summary judgment.

Plaintiff, a United States citizen, married Alegria Florendo, a native and citizen of the Philippines, on January 14, 1987. Prior to that date, on July 28, 1986, the INS had issued an Order to Show Cause against Alegria Florendo for remaining in the United States longer than permitted by her non-immigrant visa. On December 11, 1986, an immigration judge issued a final order of deportation against Alegria Florendo. In lieu of deportation, the immigration judge granted Alegria Florendo a voluntary departure, permitting her to depart the United States on or before June 11, 1987. Both the government and Alegria Florendo waived appeal of the immigration judge's order.

After marrying Alegria Florendo in January, 1987 the plaintiff submitted a visa petition to the Los Angeles INS office on March 20, 1987. This was for the purpose of classifying his wife as an "immediate relative" under 8 U.S.C. § 1151(b). As an immediate relative, Alegria Blackwell would be eligible to apply for an immigrant visa. Defendant Ernest Gustafson, the Los Angeles District Director, approved the visa petition on June 15, 1987. However, on September 15, 1987, Gustafson subsequently notified plaintiff of his intention to revoke the visa petition. The notice stated that pursuant to 8 U.S.C. §§ 1154(h) and 1255(e) of the Immigration Marriage and Fraud Amendments of 1986, the visa petition should not have been granted because Alegria Blackwell had not resided outside of the United States for two years before applying for an adjustment in status based on a marriage which was entered into while deportation proceedings were pending regarding her right to remain in the United States.

On January 27, 1988 the INS published proposed regulations corresponding to provisions of the Immigration Marriage Fraud Amendments of 1986. These regulations became final on August 10, 1988. Specifically, 8 C.F.R. § 204.1(a)(2)(C)(iii) provides that deportation proceedings are still pending, as that term is used in 8 U.S.C. § 1255(e)(2), until the alien actually departs from the United States. On April 27, 1988 the INS revoked plaintiff's visa petition. Plaintiff appealed the revocation decision to the Board of Immigration Appeals (BIA) on May 13, 1988 but the BIA dismissed the appeal on November 21, 1988. Plaintiff then filed this action.

### II. IMMIGRATION MARRIAGE AND FRAUD AMENDMENTS OF 1986

Before addressing the particulars of the issues in this case, a brief overview of the immigration system and the enactment of the Immigration Marriage and Fraud Amendments of 1986 maybe helpful. The immigration system places a ceiling on the number of immigrants who may obtain permanent residence each year and establishes numerical quotas for immigrant visas. However, the system also creates preferences for certain classes of would-be immigrants. Among those entitled to a preference are spouses of United States citizens. If an alien marries a citizen, the alien may be classified as an "immediate relative" and can be admitted for permanent residence free of any quotas. 8 U.S.C. § 1151(b). In addition, marriage to a citizen reduces the normal five year residence requirement to three years. 8 U.S.C. § 1430(a). This preferential treatment thus provides some incentive for aliens to enter into marriages with citizens in order to gain immigration benefits.

Prior to the enactment of the Immigration Marriage Fraud Amendments, any United States citizen claiming that his or her alien spouse was entitled to immediate relative status could seek an adjustment in status for the alien spouse simply by filing a petition with the Attorney General. 8 U.S.C. § 1154(a). The INS then conducted an inquiry into each petition to determine whether the marriage was bona fide or merely a sham entered into for the purpose of obtaining immigration benefits. If the INS concluded that the marriage was sincere, it granted the alien spouse permanent resident status. No adjustment was granted if the marriage was determined to be a fraud.

In 1986, Congress passed the Immigration Marriage Fraud Amendments in response to perceived abuses of this process and a growing concern about marriage fraud. While recognizing "the importance of protecting nuclear families from separation by permitting immediate family members of citizens to immigrate to the United States without numerical limitation," Congress nonetheless found that aliens "frequently find it expedient to engage in a fraudulent marriage in order to side-step the immigration law." INS surveys had revealed that "approximately 30% of all petitions for immigrant visas involve suspect marital relationships." Furthermore, Congress concluded, a need for such legislation existed because "although in theory participating in a fraudulent marriage makes an individual liable to both criminal and administrative sanctions, in practice it is very difficult to revoke or rescind an alien's status, deport him, or even locate him or his spouse." H.R.Rep. No. 99–906, 99th Cong., 2d Sess. 6 (1986), *reprinted in* 1986 U.S.Code Cong. and Admin.News 5978.

Thus, in enacting the Immigration Marriage Fraud Amendments, Congress sought to limit the potential abuse of the immigration system by postponing some of the benefits afforded an alien married to a citizen. Under the amendments, an alien who marries a citizen while no deportation proceedings are pending against the alien receives a conditional adjustment of status based on the fact of the marriage, which is granted only after the INS conducts an inquiry into the sincerity of the marriage. 8 U.S.C. § 1186a(a)(1). The alien's immigration status remains conditional for a two-year period, after which, if the marriage is in fact bona fide, the condition is removed and the alien spouse obtains permanent resident status. 8 U.S.C. § 1186a(c)(3)(B).

However, if at the time of the marriage, the alien is involved in pending deportation proceedings, the procedures prescribed by the amendments are different. When an alien who is involved in deportation proceedings marries a citizen, the alien spouse is required to reside outside the United States for a two-year period before he or she may obtain an adjustment in status based on the marriage. 8 U.S.C. § 1154(h) and 1255(e).[1] This two-year requirement is applied whether or not the marriage is in fact bona fide or a sham, and the INS conducts no inquiry into the validity of the marriage until the two-year period is completed.

The INS subsequently promulgated regulations which correspond to various provisions of the Immigration Marriage Fraud Amendments. Specifically, the regulation at issue in this case clarifies that the period

---

**1.** 8 U.S.C. Section 1255(e) states:

(1) An alien who is seeking to receive an immigrant visa on the basis of a marriage which was entered into during the period described in paragraph (2) may not have the alien's status adjusted under subsection (a) of this section.

(2) The period described in this paragraph is the period during which administrative or judicial proceedings are pending regarding the alien's right to enter or remain in the United States.

8 U.S.C. Section 1154(h) states:

Notwithstanding subsection (a) of this section, a petition may not be approved to grant an alien immediate relative status or preference status by reason of a marriage which was entered into during the period described in section 1255(e)(2) of this title, until the alien has resided outside the United States for a 2–year period beginning after the date of the marriage.

in which the alien is in deportation proceedings begins with the issuance of the Order to Show Cause and ends "when the alien departs from the United States while an order of deportation is outstanding or before the expiration of the voluntary departure time granted in connection with an alternate order of deportation." 8 C.F.R. § 204.1(a)(2)(C)(iii).

## III. DISCUSSION

Plaintiff has alleged three causes of action. First, plaintiff argues that 8 C.F.R. § 204.1(a)(2)(C)(iii) is invalid in its interpretation of "the period during which administrative or judicial proceedings are pending regarding the alien's right to enter or remain in the United States" under 8 U.S.C. § 1255(e)(2). Second, plaintiff alleges that even if C.F.R. § 204.1(a)(2)(C)(iii) is found to be consistent with its underlying statutory authority, 8 U.S.C. §§ 1154(h) and 1255(e) unconstitutionally violate plaintiff's right to due process under the Fifth Amendment by intruding into plaintiff's right to marry, creating an improper presumption that plaintiff's marriage is fraudulent and forcing plaintiff to make an untenable choice of leaving his spouse or his country. Third, plaintiff alleges that 8 U.S.C. §§ 1154(h) and 1255(e) unconstitutionally violate his right to equal protection under the Fifth and Fourteenth Amendments by imposing a far greater burden on citizens who marry aliens in deportation proceedings than upon citizens who marry aliens who are not in such proceedings.

### A. *Validity of 8 C.F.R. § 204.1(a)(2)(C)(iii)*

■ The first issue in this case involves the permissible meaning of the phrase "the period during which administrative or judicial proceedings are pending regarding the alien's right to enter or remain in the United States" in 8 U.S.C. § 1255(e)(2). The INS promulgated 8 C.F.R. 2.04(a)(2)(C)(iii), which provides that the period of time in which proceedings are pending ends when the alien departs from the United States. Plaintiff argues that the agency's regulation is an impermissible construction of 8 U.S.C. § 1255(e)(2), since the period in

which proceedings are pending ends when a final order of deportation is issued and no appeal is taken.

The standards a court must apply when a reviewing agency interpretation of a statute are embodied in the Administrative Procedure Act. The final word on interpretation of law and its applicability, whether constitutional or statutory, resides in the courts. 5 U.S.C. § 706. As a practical matter, however, the courts will consider, and often defer to, an agency's interpretation of a statute. In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court addressed the standards applied in determining the validity of an agency's interpretation of the statutes it enforces. The Court found that if Congress has not directly addressed the precise question at issue, "the court does not simply impose its own construction on the statute ... [r]ather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Furthermore, the Court stated that "the question before [the court is] not whether in its view the [interpretation] is inappropriate ... but whether the [agency's] view that it is appropriate ... is a reasonable one." 104 S.Ct. at 2781-83. *See also Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) ("When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration.").

Under this deferential standard outlined by the Supreme Court, it appears entirely reasonable for the INS to have interpreted "the period during which administrative or judicial proceedings are pending" under 8 U.S.C. § 1255(e)(2) to encompass more than just the period when the matter is pending before an immigration judge. The purpose of the Immigration Marriage Fraud Amendments was "to deter immigration related marriage fraud." H.R.Rep. No. 99-906, 99th Cong., 2d Sess. 6, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5978.

Given Congress' decision to deny immediate adjustment to alien spouses who marry citizens during the pendency of a deportation proceeding and to require those aliens to reside outside the country for two years, it would be illogical for Congress to have intended that Section 5 apply to aliens in the midst of a deportation hearing, but not to aliens who are under final orders of deportation. There is no indication in the legislative history of the Immigration Marriage Fraud Amendments that Congress only intended to prevent marriage fraud occurring before an order of deportation became final, but not after. Furthermore, as the defendants argue, the alien who does not know whether he will be found deportable has less of an incentive to engage in marriage fraud than one who knows he is deportable and has been ordered out of the country. Thus, since it functions to further the congressional intent to prevent marriage fraud, the INS interpretation appears to be a reasonable construction of 8 U.S.C. § 1255(e)(2).

Moreover, the INS had embraced this interpretation of 8 U.S.C. § 1255(e)(2) even before it promulgated 8 C.F.R. § 204.1(a)(2)(C)(iii). In *Matter of Enriquez*, Interim Decision No. 3045 (BIA January 14, 1988), which similarly involved an alien who married a citizen after having been found deportable and granted voluntary departure, the BIA stated that "the immigration judge's subsequent deportation 'order' became administratively final ... when the respondent waived his right to appeal." However, the Board continued, "[t]he deportation 'proceedings' were still pending when the respondent married a United States citizen ... because the proceedings had not been processed to a final conclusion at that point by the respondent's departure." *Id.* at 5 (citing *Matter of Chamizo*, 13 I & N Dec. 435 (BIA 1969)). The BIA noted that this interpretation furthered the objective of the Immigration Marriage Fraud Amendments. *Id.*

The Ninth Circuit has yet to address a case involving Section 5 of the Immigration Marriage Fraud Amendments. However, one court has considered this particular issue. In *Minatsis v. Brown*, 713 F.Supp. 1056, 1062 (S.D.Ohio 1989), the plaintiffs argued that no deportation proceedings were pending when they married, for the reason that once the immigration judge entered an order of deportation with an order of voluntary departure and the plaintiff waived his right to appeal, the deportation proceedings terminated. The court found no merit to the plaintiffs' narrow interpretation of the term "deportation proceedings." In granting the government's motion to dismiss, the court stated:

> [t]o so interpret the statute would defeat the legislative purpose of section 1154(h), which is to deter fraudulent marriages entered into for the purpose of evading deportation. If the Court were to construe section 1154(h) as plaintiffs suggest, an alien could complete "deportation proceedings," be ordered deported, then marry a United States citizen and obtain exemption from the order of deportation. Such a result could not have been intended by Congress in passing section 1154(h).

*Id.*

In support of his argument that "the period in which proceedings are pending" ends when a final order of deportation is issued, plaintiff refers to various immigration statutes and regulations, such as 8 U.S.C. § 1252 and 8 C.F.R. § 3.37, which provide that a decision of an immigration judge becomes final upon a waiver of appeal or upon expiration of the time for appeal if no appeal is taken. However, the issue here is not at what point a deportation order becomes final for administrative purposes or purposes of judicial review, but rather, at what point an administrative or judicial proceeding is no longer pending for purposes of the Immigration Marriage Fraud Amendments. As to this particular issue, the plaintiff has been unable to produce any authority that a deportation proceeding terminates when a deportation order becomes final.

As pointed out by the defendants, by incorporating the phrase "the period during which administrative or judicial proceedings are pending" into 8 U.S.C. § 1255(e), Congress selected a phrase not previously

used in the Immigration and Nationality Act (INA). Congress did not incorporate the term "final order of deportation," which had been previously utilized in other immigration statutes, such as 8 U.S.C. § 1252. This provides some indication that Congress did not intend to limit the timeframe to the period when an immigration judge issues an order of deportation and the alien waives his right to appeal that determination. Moreover, in responding to commentary, the INS indicated that this was in fact a part of the reasoning behind its promulgation of 8 C.F.R. § 204.a(a)(2)(C)(iii):

> This phrase encompasses more than just the period when the matter is pending before an immigration judge, on appeal to the Board of Immigration Appeals or under judicial review. It does not end when the time allotted for appeal or judicial review expires. Had Congress intended that the period described in [section 1255(e)] be limited to the period when the matter was ending before the EOIR [Executive Office for Immigration Review] or before the courts on judicial review, it would have so stated. Instead, Congress chose the broader concept including all administrative [INS or EOIR] and judicial proceedings, including [INS] proceedings occurring before and after EOIR of judicial proceedings. The application of this broader concept for this purpose in no way affects the long-established application of narrower concepts relating to the finality of orders, periods for judicial review, and so forth.

53 Fed.Reg. 30011, 30013 (August 10, 1988).

Thus, interpreting 8 U.S.C. § 1255(e)(2) as plaintiff argues could produce results which are contrary to the congressional intent behind the enactment of the Immigration Marriage Fraud Amendments. On the other hand, the INS interpretation of "the period during which administrative or judicial proceedings are pending" in 8 C.F.R. § 204.1(a)(2)(C)(iii) preserves the congressional intent to prevent marriage fraud by limiting access to the immediate adjustment of status not only to aliens who are undergoing proceedings to determine their deportability, but also to aliens against whom a final order deportation has been issued. Since the INS regulation is a reasonable construction of 8 U.S.C. § 1255(e)(2), the Court gives appropriate weight to the view of the agency entrusted to administer the immigration laws and finds 8 C.F.R. § 2.04(a)(2)(C)(iii) to be valid.

B. *Constitutionality of 8 U.S.C. Sections 1154(h) and 1255(e)—Section 5 of the Immigration Marriage Fraud Amendments*

■ Plaintiff has also challenged the constitutionality of 8 U.S.C. §§ 1154(h) and 1255(e) on due process and equal protection grounds. At the outset, it is important to note that the scope of judicial inquiry into immigration legislation is limited. It has long been recognized that the power to expel or exclude aliens is a "fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy v. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953). The Supreme Court has repeatedly emphasized that " 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977) (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909)).

■ Deferential review is employed even where the constitutional challenge is based upon the rights of a United States citizen. The decision in *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 2585, 33 L.Ed.2d 683 (1972) indicates that when an immigration decision is asserted to have infringed a citizen's fundamental rights, the Supreme Court may refuse even to balance the citizen's interest against the government's plenary power. In *Kleindienst*, the Supreme Court affirmed the Attorney General's denial of a visa for a Marxist scholar even though this denial infringed on the First Amendment rights of the United States citizens who wanted to hear him speak. The Court held that "when the Executive exercises this power negatively on the ba-

sis of a facially legitimate and bona fide reason, the courts will neither look behind, nor test it by balancing its justification against the first amendment interest of those who seek personal communication with the applicant." *Id.* at 2585.

Moreover, even the fact that a statute may impinge on the marital relationship does not appear to trigger a higher standard of review than is normally employed in analyzing constitutional challenges to immigration statutes. Granted, a statute which imposes a heavy burden on the marital relationship would ordinarily be subject to searching review in order to determine whether it is carefully crafted to achieve important governmental goals. *See, e.g., Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 679, 54 L.Ed.2d 618 (1978) (striking down a state statute that prohibited marriage by a noncustodial parent of minor children unless the parent could show that the children were unlikely to become public charges). The right to marry has been deemed of fundamental importance, and matters relating to marriage and family are accorded special protection under our constitutional scheme. *Id.* at 679–80. *See also Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965) (state law prohibiting the use and sale of contraceptives unconstitutional because it unjustifiably interfered with marital privacy). However, the argument for a stricter standard of review seems to have been foreclosed by the Supreme Court in *Fiallo,* 97 S.Ct. at 1479. In that case, the Court specifically rejected an equal protection challenge that an immigration statute should be subjected to more rigorous scrutiny than normally applied to such legislation because the statute impinged on the family relationship. Applying a rational basis analysis, the Court stated "[w]e can see no reason to review the broad congressional policy choice at issue here under a more exacting standard than was applied in *Kleindienst v. Mandel,* a first amendment case." *Id.* Again emphasizing the limited scope of judicial inquiry into immigration legislation, the Court stated, "[i]t is not the judicial role in cases of this sort to probe

and test the justifications for the legislative decision." *Id.* at 1481–82.

Similar to the case at hand, *Fiallo* involved a constitutional challenge to a statute placing restrictions on petitions for "immediate relative" status. The statute denied an adjustment in status to the illegitimate alien children whose natural fathers are United States citizens, but granted petitions to those illegitimate children whose natural mothers are United States citizens. The Court applied a rational basis analysis even though the statute drew distinctions based on sex and illegitimacy, classifications normally associated with a stricter standard of review. *Id.* at 1479. While *Fiallo* involved familial association and the present case involves rights surrounding the marital relationship, there appears to be no discernible basis "for giving this fundamental right [to marry] any greater weight in this context ·than that given to the analogous familian rights asserted in *Fiallo.*" *Escobar v. INS,* 700 F.Supp. 609, 612 (D.D.C.1988).

The Ninth Circuit has not addressed the constitutionality of 8 U.S.C. §§ 1154(h) and 1255(e) of the Immigration Marriage Fraud Amendments. However, the few courts which have considered this issue have applied a deferential standard of review to reject all constitutional challenges to the statutes. *See Anetekhai v. INS,* 876 F.2d 1218 (5th Cir.1989) (affirmed district court's dismissal of married couple's complaint, holding that 8 U.S.C. § 1154(h) does not unconstitutionally violate due process or equal protection under the Fifth Amendment, the right to privacy and association under the First Amendment, nor the Ninth and Tenth Amendments); *Almario v. Attorney General,* 872 F.2d 147 (6th Cir.1989) (affirmed summary judgment for defendants, holding that Section 5 of the Immigration Marriage Fraud Amendments does not unconstitutionally violate married couple's due process and equal protection rights under the Fifth Amendment); *Azizi v. Thornburgh,* 719 F.Supp. 86 (D.Conn. 1989) (granted summary judgment for defendants, holding that Section 5 of the Immigration Marriage Fraud Amendments does not unconstitutionally violate married

couple's due process and equal protection rights under the Fifth Amendment); *Minatsis v. Brown*, 713 F.Supp. 1056 (S.D. Ohio 1989) (granted defendants' motion to dismiss, holding that 8 U.S.C. § 1154(h) does not violate First, Fifth or Ninth Amendments); *Escobar v. INS*, 700 F.Supp. 609 (D.D.C.1988) (granted defendants' motion to dismiss, upholding the constitutionality of Section 5 of the Immigration Marriage Fraud Amendments on Fifth Amendment due process and equal protection grounds); *Smith v. INS*, 684 F.Supp. 1113 (D.Mass.1988) (granted defendants' motion for summary judgment, holding that Section 5 of the Immigration Marriage Fraud Amendments does not violate married couple's rights to due process and equal protection under the Fifth Amendment).

### 1. The Due Process Claims

#### a. Procedural Due Process

■ Plaintiff argues that Section 5 of the Immigration Marriage Fraud Amendments unconstitutionally deprives him of procedural due process because it places a burden on his marital relationship without first giving him the opportunity to prove the legitimacy of his marriage to Alegria Blackwell. The Supreme Court has held that the government must provide appropriate procedural safeguards before it may deprive a citizen of life, liberty or property. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). However, before the right to procedural due process attaches, a plaintiff must have an interest which is encompassed within the meaning of liberty or property by virtue of the fact that it has been recognized and protected by the Constitution or by statute. *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976).

In this case, plaintiff can identify no protected liberty or property interest which is created by either the Constitution or a statute that would entitle him to a hearing on a procedural due process theory. Plaintiff faces a difficult dilemma, but the Constitution does not recognize the right of a citizen spouse to have his alien spouse remain in this country. *Almario*, 872 F.2d at 151. *See Burrafato v. United States Department of State*, 523 F.2d 554, 555 (2d Cir. 1975), *cert. denied*, 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 313 (1976) (no constitutional right of a citizen spouse is violated by deportation of his or her alien spouse). Plaintiff has identified no statute which grants him a constitutionally protected interest in having his alien wife remain in the United States. The statute at issue in this case grants no interest that triggers due process—rather, it "specifically denies the immigration benefits that the [plaintiff seeks] to acquire." *Smith*, 684 F.Supp. at 1118.

Thus, even though Section 5 of the Immigration Marriage Fraud Amendments places a burden on plaintiff's marriage by imposing a two-year foreign residency requirement, plaintiff has no protected interest which would entitle him to a hearing on a procedural due process theory. As stated by the court in *Almario*:

> Section 5 specifically attempts to eliminate marriage fraud involving United States citizens and aliens subject to deportation. Congress, therefore, could not avoid affecting marriage in its efforts to eliminate marriage fraud.... In an effort to reduce the number of sham marriages, Congress, therefore, had a bona fide reason for enacting a statute that imposes a two year foreign residency requirement on deportable aliens. Accordingly, any denial of procedural due process created by Section 5 may only be remedied by Congress and not the courts.

*Almario*, 872 F.2d at 151.

#### b. Substantive Due Process

■ Plaintiff also argues that Section 5 of the Immigration Marriage Fraud Amendments interferes with his right to marry and operates as an irrebuttable presumption that his marriage is fraudulent, denying him of his constitutional right to due process of law.

As noted above, the constitutional protection ordinarily afforded the marital relationship is more limited when Congress

seeks to exercise its plenary power over matters of immigration. Significantly, the burden imposed by Section 5, while substantial, did not prevent plaintiff from marrying, nor will it preclude Alegria Blackwell from receiving immediate relative status following the two-year foreign residency. Rather, Section 5 is a preventive measure to protect against marriage fraud based on Congress' rational belief that the incidence of marriage fraud is higher among those aliens who are faced with imminent deportation than those who are not. *See Smith v. INS,* 684 F.Supp. at 1119.

As to plaintiff's argument that Section 5 violates his due process rights by creating an irrebuttable presumption that his marriage is fraudulent, Section 5 does not require a two-year foreign residency because it presumes that the marriage is fraudulent. Rather, as stated in *Smith:*

> The Court rejects plaintiffs' suggestion that the Marriage Fraud Amendments constitute any sort of legislative determination or pronouncement that their marriage is a sham. To the contrary, the amendments render the issue of sincerity irrelevant altogether on the question of whether [the plaintiff] may lawfully remain in this country.... Under the statutory scheme as amended, however, [the plaintiff] and others like him must reside outside of the United States for the two year period whether their marriages are grounded on the best of intentions or the basest of motives.

*Id.* at 1118.

Section 5 requires an alien in plaintiff's wife's position to leave the United States for a two year period simply because the timing of the marriage places her in that class of aliens for whom a two year foreign residency is required. Again, Congress rationally could conclude that this provision would deter those who are faced with imminent deportation from entering into fraudulent marriages for the purpose of gaining immigration benefits.

Moreover, the Supreme Court has applied a rational basis test to uphold similar classifications challenged on the basis that they create irrebuttable presumptions. In *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), the Supreme Court upheld a social security law which, like Section 5, targeted fraudulent marriages for the purposes of obtaining benefits and did not provide appellants with an opportunity to prove that their marriages were valid. The Court stated that it was not unconstitutional for Congress to create arbitrary lines because:

> ... the question raised is not whether a statutory provision precisely filters out those, and only those who are in the factual position which generated the congressional concern reflected in the statute. Such a rule would ban all prophylactic provisions.... Nor is the question whether the provision filters out a substantial part of the class which caused congressional concern, or whether it filtered out more members of the class than nonmembers. The question is whether Congress, its concern having been reasonably raised by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule.

*Id.* at 2472.

In the instant case, Congress acted rationally in enacting Section 5 of the Immigration Marriage Fraud Amendments and plaintiff's substantive due process challenges are rejected.

### 2. The Equal Protection Claim

■ Finally, plaintiff claims that Section 5 of the Immigration Marriage Fraud Amendments violates his right to equal protection clause because it imposes a greater burden on citizens who marry aliens involved in deportation proceedings than upon those citizens who marry aliens who are not in such proceedings. However, as discussed above, the extraordinarily broad power of Congress over immigration matters is well-established. The Su-

preme Court has stated that even where the constitutional challenge is based upon the rights of a United States citizen, the court should defer to Congress. *See Kleindienst*, 92 S.Ct. at 2585. Moreover, *Fiallo* indicates that the fact that the statute impinges on the marital relationship also should not mandate a higher standard of review than is normally employed in analyzing constitutional challenges to immigration statutes. Thus, the role of the courts in analyzing an equal protection challenge to a federal immigration statute is limited to determining whether the statute at issue is rationally related to the achievement of a legitimate federal interest. *Smith*, 684 F.Supp. at 1117. The distinction Congress has drawn between aliens who marry while in deportation proceedings and aliens who marry before such proceedings have begun is related to Congress' strong interest in deterring fraudulent marriages. As stated by the court in *Smith:*

> It cannot be denied that Congress has a strong and legitimate interest in deterring marriages which are entered solely for the purpose of obtaining immigration benefits. Nor is it illogical to assume that aliens who are engaged in deportation proceedings are more likely than other aliens to enter into fraudulent marriages in order to avoid being expelled from the country. In many instances, these aliens will have no valid defense to deportation and marriage to an American citizen may be their only hope for remaining in this country. The amendments are designed to deter marriage fraud in this susceptible group by removing the incentive to engage in a fraudulent marriage.

*Id.*

Thus, since it is rational to conclude that the two-year foreign residency requirement in Section 5 would have some effect in reducing the incidence of marriage fraud, the Court rejects plaintiff's equal protection challenge.

### IV. CONCLUSION

Plaintiff's first cause of action involves the permissible meaning of the phrase "the period during which administrative or judicial proceedings are pending regarding the alien's right to enter or remain in the United States" in 8 U.S.C. Section 1255(e)(2). The INS regulation at 8 C.F.R. Section 204.1(a)(2)(C)(iii) is a reasonable construction of Section 1255(e)(2) because it functions to preserve the congressional intent to prevent marriage fraud. Giving appropriate weight to the view of the INS, which is entrusted to administer the immigration laws, the Court finds 8 C.F.R. Section 204.-1(a)(2)(C)(iii) to be valid.

In his second and third causes of action, plaintiff has challenged the constitutionality of Section 5 of the Immigration Marriage Fraud Amendments of 1986, codified at 8 U.S.C. Sections 1154(h) and 1255(e), on due process and equal protection grounds. For the reasons stated herein, the Court finds Section 5 of the Immigration Marriage Fraud Amendments to be constitutional.

While the defendants have moved the Court to dismiss the complaint and plaintiff has filed a cross-motion for summary judgment, both parties' arguments focus on the same issues—the correct interpretation of 8 U.S.C. Section 1255(e)(2) and the constitutionality of Section 5 of the Immigration Marriage Fraud Amendments. Neither party has argued the existence of a factual dispute.

However, in denying summary judgment for the plaintiff, the question arises as to whether the Court should grant the motion to dismiss or summary judgment for the defendants. Either would be possible under the law. The Ninth Circuit has indicated that it is permissible for a court to analyze constitutional claims under a motion to dismiss. *United States v. Aquilar*, 871 F.2d 1436, 1470 (9th Cir.1989) (holding that since the government's interest in controlling immigration outweighed defendants' asserted First Amendment religious interest, the district court did not err in denying defendants' motion to dismiss). The Ninth Circuit has also recognized that when a party moves for summary judgment and at the hearing, it is made to appear from all the records, files, affidavits and documents presented that there is no genuine dispute respecting a material fact

essential to the proof of the movant's case, the court may sua sponte grant summary judgment to the nonmoving party. *Cool Fuel, Inc. v. Connett,* 685 F.2d 309, 311 (9th Cir.1982) (holding that in taxpayer's action to enjoin IRS from collecting assessed deficiency, where parties had every opportunity to explore issues inherent in prayer for equitable relief and did so to extent deemed desirable, district court's sua sponte grant of summary judgment to IRS was not unfair).

Thus, given that no factual dispute exists between the parties, and having resolved the questions of law raised by the parties in favor of defendants, the Court grants summary judgment for the defendants.