**Paul and Mona ANETEKHAI,**
**Plaintiffs–Appellants,**

v.

**IMMIGRATION AND NATURALIZA-**
**TION SERVICE,**
**Defendant–Appellee.**

Nos. 88–3191 & 88–3450.

United States Court of Appeals,
Fifth Circuit.

July 12, 1989.

Catherine Lampard, Malvern C. Burnett, New Orleans, La., for plaintiffs-appellants.

Lucas Guttentag, ACLU, Immigration Task Force, New York City, William Patrick Quigley, ACLU of La., New Orleans, La., for amicus-ACLU.

Peter D. Williamson, Kelly A. Chaves, Houston, Tex., for amicus-Bright & Marcia.

David V. Bernal, Atty., Office of Imm. Lit., Civ. Div., U.S. Dept. of Justice, Washington, D.C., Reneé Clark McGinty, Asst. U.S. Atty., John P. Volz, U.S. Atty., New Orleans, La., for defendant-appellee.

Before ALDISERT\*, REAVLEY and HIGGINBOTHAM, Circuit Judges.

REAVLEY, Circuit Judge:

Appellants Paul and Mona Anetekhai brought this suit challenging the constitutionality of Section 5(b) of the Immigration Marriage Fraud Amendments of 1986 ("IMFA"), 8 U.S.C. § 1154(h). The district court, holding that § 1154(h) is constitutional, entered judgment in favor of the Immigration and Naturalization Service ("INS") and dismissed the Anetekhais' complaint. We affirm.

I.

The Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, provides that "immediate relatives" of United States citizens are exempt from statutorily imposed numerical immigration quotas. 8 U.S.C. § 1151(a). Accordingly, an alien who qualifies as an "immediate relative" is granted resident status ahead of thousands of other aliens who seek to immigrate to the United States each year. A spouse of a United States citizen is by definition an "immediate relative." 8 U.S.C. § 1151(b).[1]

---

\* Circuit Judge of the Third Circuit, sitting by designation.

1. 8 U.S.C. § 1151(b) provides as follows:

Prior to the enactment of the IMFA in 1986, any United States citizen claiming that his or her alien spouse was entitled to immediate relative status could seek an adjustment in status for the alien spouse simply by "fil[ing] a petition with the Attorney General for such classification." 8 U.S.C. § 1154(a). If, after an investigation, the Attorney General determined that the facts stated in the petition were true—in other words, if the Attorney General concluded that the marriage was bona fide— then the status of the alien spouse was adjusted to that of permanent resident alien. 8 U.S.C. § 1154(b). If, on the other hand, the Attorney General determined that the marriage had been entered into fraudulently for the purpose of obtaining immigration benefits, no adjustment in status was made.

Perceived abuses of this process and the difficulty of ferreting out sham marriages prompted Congress to enact the IMFA. Under the IMFA, an alien who marries a United States citizen while no deportation proceedings are pending against him receives a two-year conditional adjustment of status so long as the investigation into the facts surrounding the marriage reveal that it is bona fide. *See generally* 8 U.S.C. § 1186a. In order for the conditional status to be removed at the end of the two-year period, the couple must submit a joint petition to the Attorney General in accordance with statutory requirements and must appear for a personal interview. 8 U.S.C. § 1186a(c)(1). If the Attorney General concludes that the facts and information provided by the couple are true, the condition is removed and the alien spouse obtains full permanent resident status. 8 U.S.C. § 1186a(c)(3)(B).

The procedure that a couple must follow in order for the alien spouse to obtain preferential status is different if, at the time of the marriage, the alien is involved in deportation proceedings. In that case the alien spouse is required to reside outside the United States for a two-year period before he or she may obtain an adjustment in status based on the marriage. 8 U.S.C. § 1154(h) [2] and § 1255(e).[3] It is this aspect of the IMFA which is at issue here.

In January 1982, Paul Anetekhai, a Nigerian citizen, entered the United States on a nonimmigrant student visa. In February 1986, the INS, having discovered that Paul was employed without authorization, commenced deportation proceedings against him. Also in early 1986, Paul met and began dating Mona Morris; they married in January 1987. Believing that his marriage to a United States citizen would entitle him to an immediate adjustment in status and thus make the deportation proceedings unnecessary, Paul moved to dismiss the proceedings. The immigration judge denied the motion and, finding Paul deportable, granted him until January 31, 1988, to depart voluntarily from the United States. The INS later extended the date for departure to February 28, 1988.

The Anetekhais filed this lawsuit on February 26, 1988, seeking declaratory and injunctive relief. In the original complaint they alleged that § 1154(h) is unconstitutional in that it violates their rights to

The "immediate relatives" referred to in subsection (a) of this section shall mean the children, spouses, and parents of a citizen of the United States: *Provided,* That in the case of parents, such citizen must be at least twenty-one years of age. The immediate relatives specified in this subsection who are otherwise qualified for admission as immigrants shall be admitted as such, without regard to the numerical limitations in this chapter.

**2.** 8 U.S.C. § 1154(h) provides as follows:
Notwithstanding subsection (a) of this section, a petition may not be approved to grant an alien immediate relative status or preference status by reason of a marriage which was entered into during the period described in

section 1255(e)(2) of this title, until the alien has resided outside the United States for a 2–year period beginning after the date of the marriage.

**3.** 8 U.S.C. § 1255(e) provides as follows:
(1) An alien who is seeking to receive an immigrant visa on the basis of a marriage which was entered into during the period described in paragraph (2) may not have the alien's status adjusted under subsection (a) of this section.
(2) The period described in this paragraph is the period during which administrative or judicial proceedings are pending regarding the alien's right to enter or remain in the United States.

equal protection and due process under the Fifth Amendment as well as their "First Amendment rights to privacy and association." In their first amended complaint, the Anetekhais asserted that § 1154(h) also violates the Ninth and Tenth Amendments. The district court, relying on *Fiallo v. Bell*, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) and *In re Longstaff*, 716 F.2d 1439 (5th Cir.1983), *cert. denied*, 467 U.S. 1219, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984), held that § 1154(h) is constitutional and wrote that "[w]e decline to substitute our judgment for that of Congress. It is within Congress' plenary power over immigration matters to impose, for the purpose of deterring fraudulent marriages, a 2–year non-residency requirement for aliens who marry U.S. citizens while subject to deportation proceedings." *Anetekhai v. INS*, 685 F.Supp. 599, 601 (E.D.La.1988). The Anetekhais appeal from the district court's dismissal of their complaint.

## II.

In addressing the constitutionality of an immigration provision, "it is important to underscore the limited scope of judicial inquiry into immigration legislation." *Fiallo*, 430 U.S. at 792, 97 S.Ct. at 1478. The broad power that Congress possesses to decide not only which classes of aliens may enter the United States but also the terms and conditions of their entry cannot be disputed. *See Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909) ("But over no conceivable subject is the legislative power of Congress more complete than it is over" the admission of aliens.). In 1895, Justice Harlan wrote that

[t]he power of congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that

regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications.

*Lem Moon Sing v. United States*, 158 U.S. 538, 547, 15 S.Ct. 967, 970, 39 L.Ed. 1082 (1895). The Supreme Court has reaffirmed this principle repeatedly over the years. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 596–97, 72 S.Ct. 512, 522–23, 96 L.Ed. 586 (1952) (Frankfurter, J., concurring); *Shaughnessy v. United States*, 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953); *Kleindienst v. Mandel*, 408 U.S. 753, 766, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972); *Fiallo*, 430 U.S. at 792, 97 S.Ct. at 1478. The Court also has recognized that, in exercising its broad discretion over immigration, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews v. Diaz*, 426 U.S. 67, 80, 96 S.Ct. 1883, 1891, 48 L.Ed.2d 478 (1976).

The Anetekhais do not deny that, ordinarily, courts should be highly deferential in reviewing congressional enactments in the areas of immigration and naturalization. They argue, however, that we should apply strict scrutiny in analyzing the immigration provision at issue here since § 1154(h) "affects Mona's fundamental rights in the domestic area." The Supreme Court rejected this very argument in *Fiallo*. There, the appellants, who were three sets of unwed natural fathers and their illegitimate offspring, challenged as unconstitutional that part of the INA which granted "immediate relative" status to illegitimate children whose natural mothers were United States citizens but denied that status to those whose natural fathers were United States citizens.[4] The Court conceded that the case before it implicated "the fundamental constitutional interests of United States citizens … in a familial

---

4. The appellants in *Fiallo* asserted that the statute (1) denied them equal protection by discriminating against them "on the basis of the father's marital status, the illegitimacy of the child and the sex of the parent," (2) denied them due process of law to the extent that there was established "an unwarranted conclusive presumption" of the absence of strong ties between natural fathers and their illegitimate children, and (3) seriously burdened and infringed upon their rights "to mutual association, to privacy, to establish a home, to raise natural children and to be raised by the natural father." *Fiallo*, 430 U.S. at 791, 97 S.Ct. at 1477. The Anetekhais raise virtually identical claims with regard to § 1154(h).

relationship," *Fiallo*, 430 U.S. at 794, 97 S.Ct. at 1479, yet ultimately rejected the appellants' suggestion that, based on that fact, a more searching judicial scrutiny was required. Instead, the Court applied only minimum scrutiny in analyzing the statute. Noting that, with respect to each legislative policy distinction drawn in the area of immigration, "it could be argued that the line should have been drawn at a different point," the Court wrote that "these are policy questions entrusted exclusively to the political branches of our Government and we have no judicial authority to substitute our political judgment for that of Congress.... [I]t is not the judicial role in cases of this sort to probe and test the justifications for the legislative decision." *Id.* at 798–99, 97 S.Ct. at 1481–82.

▪ Of prime importance in the Court's decision to review the INA provisions challenged in *Fiallo* with such deference was its conclusion that at issue there were the rights of the alien children, not the rights of United States citizens. Indeed, it was this very point which divided the majority from the dissent. *Fiallo*, 430 U.S. at 795 n. 6, 97 S.Ct. at 1479 n. 6. Similarly, in this case we are concerned with whatever rights Mr. Anetekhai, the alien spouse, may possess—not the rights of Mrs. Anetekhai.[5] That Mrs. Anetekhai asserts her fundamental right to marry here does not alter our analysis.[6] In *Fiallo*, the Supreme Court, too, was dealing with the citizens' fundamental interests in familial relationships.

▪ Applying the deferential standard of review articulated in *Fiallo* to the case before us, we have no difficulty in conclud-

ing that § 1154(h) passes constitutional muster.[7] The Anetekhais admit that Congress has a strong and legitimate interest in deterring marriages which are entered into for the purpose of obtaining immigration benefits. We, like the other courts that have considered this issue, believe that Congress logically could have concluded that aliens who are engaged in deportation proceedings are more likely than aliens not so situated to enter into fraudulent marriages as a means of avoiding expulsion from the United States. *See, e.g., Almario v. INS*, 872 F.2d 147 (6th Cir.1989); *Escobar v. INS*, 700 F.Supp. 609, 612 (D.D.C. 1988); *Smith v. INS*, 684 F.Supp. 1113, 1117 (D.Mass.1988). "Since marriage to a United States citizen will no longer allow an alien engaged in deportation proceedings to remain in this country, it is rational to conclude that the two-year non-residency requirement will have some effect in reducing the incidence of marriage fraud" within this class of aliens. *Smith*, 684 F.Supp. at 1117.

In its amicus brief, the American Civil Liberties Union ("ACLU") attempts to distinguish *Fiallo* from this case. It argues that the issue in *Fiallo* was the validity of a statute establishing classes of admissible aliens. The ACLU concedes that Congress has virtually unlimited power in making such policy decisions. It argues that in this case, however, no policy decision is at issue. Instead, according to the ACLU, "the statute recognizes that aliens who marry citizens are admissible and then establishes a procedure designed to deny im-

---

5. Obviously our decision will have a significant impact on Mrs. Anetekhai's interests. We note, however, that Mrs. Anetekhai has no constitutional right to have her alien spouse remain in the United States. *See Burrafato v. United States Department of State*, 523 F.2d 554, 555 (2d Cir.1975), *cert. denied*, 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 313 (1976).

6. Nor does the fact that Mrs. Anetekhai asserts her "First Amendment rights to privacy and association" affect the outcome here. The Supreme Court made clear in *Fiallo* that, in ruling on the constitutionality of a provision, we are to apply the same standard regardless of whether Fifth Amendment or First Amendment rights

are asserted. *Fiallo*, 430 U.S. at 795, 97 S.Ct. at 1479 ("We can see no reason to review the broad congressional policy choice at issue here under a more exacting standard than was applied in *Kleindienst v. Mandel*, a First Amendment case.").

7. The INS argues that the test for determining the constitutionality of an immigration provision is whether it is based upon a "facially legitimate and bona fide reason." *See Fiallo*, 430 U.S. at 794–95, 97 S.Ct. at 1479 (citing *Kleindienst*, 408 U.S. at 770, 92 S.Ct. at 2585). Because we conclude that § 1154(h) easily passes a rational basis test, we need not decide whether some lesser standard might be appropriate.

migrant visas to aliens who base their claims on a fraudulent marriage." The ACLU contends that, because the procedure does not afford couples the opportunity to demonstrate that their marriages are not fraudulent, the statute violates their rights to procedural due process. We disagree.

As an initial matter, we reject the ACLU's attempt to characterize § 1154(h) as a matter of procedure only. Inherent in Congress' broad policy making power in the area of immigration law is the power to prescribe reasonable procedures by which that policy may be implemented. Congress made a policy decision to distinguish aliens who marry while involved in deportation proceedings from aliens who marry at other times. This decision, in effect, created two classes of alien spouses. The first class, those aliens who marry United States citizens at a time when no deportation proceedings are pending against them, follows track one. Their citizen spouses may petition on their behalf for an adjustment in status at any time after they are married; if the petition is approved, the alien is granted preferred status on a conditional basis for a two-year period. The second class, those aliens who marry after deportation proceedings are initiated against them, follow track two. In order for these aliens to obtain immediate relative status, they must reside outside the United States for a two-year period before they may obtain an adjustment in status. We believe that Congress acted well within its power in establishing this policy and procedure.

▇ In addition, we disagree with the ACLU's suggestion that § 1154(h) deprives alien spouses of any protected interests in "immigrant visas." Far from being a provision designed to deprive aliens of benefits to which that are entitled, § 1154(h) is part and parcel of the statutory scheme under which those benefits are conferred in the first instance. The section title itself states: "Procedure for *granting* immigrant status." 8 U.S.C. § 1154 (emphasis added). Procedural due process guarantees attach only when the government *deprives* a citizen or alien of life, liberty or property. *Plyler v. Doe,* 457 U.S. 202, 210, 102 S.Ct. 2382, 2391, 72 L.Ed.2d 786 (1982); *Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972).

In concluding that § 1154(h) does not deprive Mr. Anetekhai of a protected interest, we do not mean to suggest that he is entitled to absolutely no due process under that provision. We simply hold that the process which he is due is limited to fair procedures to determine whether § 1154(h) was invoked properly. In other words, if the Anetekhais had married before the INS initiated deportation proceedings against Mr. Anetekhai, he would be entitled to demonstrate that fact. *See Escobar,* 700 F.Supp. at 613. They do not claim that this is the case here.

The Anetekhais argue, however, that § 1154(h) violates their due process rights by creating an irrebuttable presumption that their marriage, and every other marriage entered into during deportation proceedings, is fraudulent; they maintain that, before this conclusion can be reached, they must be afforded the opportunity to present contrary evidence. Certainly, if Congress had conditioned an alien's eligibility for a status adjustment on the existence of a bona fide marriage, procedural due process would require that the couple be given an opportunity to establish that fact before an adjustment could be denied. *See Smith,* 684 F.Supp. at 1118. That is not what Congress did here, however. Section 1154(h) does not require a two-year nonresidency because it presumes that the marriage is fraudulent. Instead, the statute requires an alien in Mr. Anetekhai's position to leave the United States for a two year period simply because the timing of his marriage places him in that class of aliens for whom a two-year nonresidency is required. Again, Congress rationally could conclude that this provision would deter those who are faced with imminent deportation from entering into fraudulent marriages for the purpose of gaining immigration benefits.

The Anetekhais also argue that, because there are several ways in which § 1154(h)

can be avoided, it is not rationally related to the government's interest in deterring marriage fraud. We recognize that there are several ways in which a couple could avoid the seemingly harsh results of this provision, and that there may be better ways for Congress to accomplish its objective of deterring marriage fraud. However, we cannot conclude that because there might be a better way to write the statute, the statute as it exists is irrational.

Nor do we agree with the ACLU that § 1154(h) "suffers from precisely the same defect" that *Francis v. INS*, 532 F.2d 268 (2d Cir.1976), held to be irrational. In *Guan Chow Tok v. INS*, 538 F.2d 36, 38–39 (2d Cir.1976), the Second Circuit explained that "[i]n *Francis*, we held it irrational to distinguish between two categories of narcotic offenders on the basis of a brief visit out of the country. Here, the distinction is between narcotic offenders and other offenders, a distinction that has a rational basis." Similarly, in this case, the distinction is between aliens who marry while involved in deportation proceedings and aliens who marry at other times. This distinction, too, has a rational basis. Section 1154(h) withstands constitutional challenge under the Fifth and First Amendments.

### III.

The Anetekhais also challenge § 1154(h) under the Ninth and Tenth Amendments. They claim that, in enacting § 1154(h), "Congress overstepped its authority by purporting to regulate Louisiana marriages." This argument is without merit. The two-year nonresidency requirement of § 1154(h), by itself, does not in any way affect the legal status of the Anetekhais' marriage under state law. *See* La. Civ.Code Ann. art. 138 (West Supp.1989); La.Rev.Stat.Ann. § 9:301 (West Supp.1989).

AFFIRMED.