Saboet Elmazi AZIZI and Feim Azizi

v.

Richard L. THORNBURGH, Attorney General of the United States.

Civ. No. H–87–957(AHN).

United States District Court, D. Connecticut.

Aug. 2, 1989.

Ryszard S. Mrotek, and William J. Anastasi, Martha Stone, and Philip D. Tegeler, Conn. Civ. Liberties Union Foundation, Hartford, Conn., Lucas Guttentag, and Judy Rabinovitz, American Civ. Liberties Union, Immigration Task Force, New York City, for plaintiff.

David V. Bernal, Office of Immigration Litigation U.S. Dept. of Justice, Washington, D.C., for defendant.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

NEVAS, District Judge.

Plaintiff Feim Azizi, a Yugoslav national, illegally entered the United States on February 24, 1986 at Brownsville, Texas and was apprehended shortly thereafter. Two days later the government began deportation proceedings against him. On December 29 of that same year, he married plaintiff Saboet Elmazi Azizi, a naturalized American citizen known to Feim Azizi since their childhoods in Yugoslavia. The marriage triggered Section 5 of the Immigration Marriage Fraud Amendments of 1986 ("IMFA"), codified at 8 U.S.C. Sections 1154(h) & 1255(e), which mandates that an alien who marries an American citizen during deportation or exclusion proceedings reside *outside* the United States for two years before the Immigration and Naturalization Service ("INS") will consider adjustment in the alien's immigration status.[1] Conversely, under Section 2 of the IMFA, 8 U.S.C. Section 1186a, an alien who marries before such proceedings begin can demon-

---

**1.** 8 U.S.C. Section 1255(e) provides:

(1) An alien who is seeking to receive an immigrant visa on the basis of a marriage which was entered into during the period described in paragraph (2) may not have the alien's status adjusted under subsection (a) of this section.

(2) The period described in this paragraph is the period during which administrative or judicial proceedings are pending regarding the alien's right to enter or remain in the United States.

8 U.S.C. Section 1154(h) provides:

Notwithstanding subsection (a) of this section, a petition may not be approved to grant an alien immediate relative status or preference status by reason of a marriage which was entered into during the period described in section 1255(e)(2) of this title, until the alien has resided outside the United States for a 2–year period beginning after the date of the marriage.

The IMFA became effective on November 10, 1986, some five weeks before the plaintiffs' marriage.

strate the validity of his or her marriage without having to leave the United States for the two-year waiting period. Section 5 creates the irrebutable presumption that an alien who marries during deportation or exclusion proceedings has entered into a fraudulent marriage.

The plaintiffs have launched a multi-faceted constitutional challenge to section 5; the government has filed a dispositive motion of its own. When distilled to their essence the pending cross-motions for summary judgment require the court to balance the plaintiffs' fundamental constitutional right to marry against the discretion traditionally enjoyed by Congress in the immigration and naturalization area. The half dozen or so federal courts—including two courts of appeal—which have considered constitutional attacks on section 5 have all deferred to Congress.[2] The Azizis also press an estoppel claim against the government, arguing that they relied to their detriment on misrepresentations given them by various INS officials.

## I.

### A.

The Immigration and Naturalization Act ("INA") exempts "immediate relatives"—including spouses—of American citizens from the numerical quotas placed on immigrant visas. 8 U.S.C. Section 1151(b). In most instances immediate relatives automatically qualify for permanent residency, and eventually citizenship, in the United States. Because marriage to an American citizen greatly facilitates entry into and residency in this country, for some aliens it has undoubtedly proven an irresistible ave-

nue for bypassing the more cumbersome and uncertain administrative procedures prescribed for those who are not immediate relatives. To investigate what it perceived as the growing incidence of marriage fraud between aliens and American citizens, Congress in 1985 created a subcommittee to focus on the size and scope of the problem. *See generally Fraudulent Marriage and Fiance Arrangements to Obtain Permanent Resident Status: Hearings Before the Subcomm. on Immigration and Refugee Policy of the Senate Comm. on the Judiciary*, 99th Cong., 1st Sess. (1985). The subcommittee concluded that such marriage fraud was a prevalent problem. *Id.* at 23 (statement of the Deputy Assistant Secretary of State for Visa Services). The INS itself has theorized that fraud plays a role in some 30% of all immigration visa petitions grounded on marriage to an American citizen. H.R.Rep. No. 906, 99th Cong., 2d Sess. 6, *reprinted in* 1986 U.S. Code Cong. & Admin.News 5978, 5978. "[O]f the three relationships which qualify for the preferential 'immediate relative' status—parental, filial, and spousal—the latter is the easiest to fraudulently engineer: it is largely self-created and can be accomplished with a minimum of traditional, civil, or religious trappings." Note, *Alienating Sham Marriages For Tougher Immigration Penalties: Congress Enacts The Marriage Fraud Act*, 15 Pepperdine L.Rev. 181, 187 (1988).

As a response to these concerns, Congress promulgated the IMFA as a supplement to the INA. Under the INA an alien with immediate relative status could, in most instances, easily acquire permanent residency.[3] Purportedly fashioned as a deterrent to marriage fraud, the IMFA

2. *See, e.g., Anetekhai v. INS,* 876 F.2d 1218 (5th Cir.1989); *Almario v. Attorney General,* 872 F.2d 147 (6th Cir.1989); *Minatsis v. Brown,* 713 F.Supp. 1056 (S.D.Ohio 1989); *Escobar v. INS,* 700 F.Supp. 609 (D.D.C.1988); *Smith v. INS,* 684 F.Supp. 1113 (D.Mass.1988).

3. To be eligible for permanent resident status, the citizen spouse would file an "I–130" petition on the alien spouse's behalf. An INS officer would then review the petition, conduct an interview with the couple, and decide whether a bona fide marriage existed.

Fact patterns likely to red-flag the attention of INS with respect to marriage fraud are large age disparity between the parties or greatly dissimilar backgrounds; where the marriage is entered immediately after the alien enters the United States or just prior to deportation; where there have been many prior marriages for either party, especially where the petitioner has filed for aliens before, or where the alien has been the beneficiary of another petition that was denied or withdrawn; where the husband and wife do not speak the same language; where the marriage was arranged by a third party; where

makes such residency a more difficult perquisite to obtain. Now, under section 2 of the new legislation, an alien who marries a citizen before deportation proceedings begin is granted "conditional" permanent resident status after the INS conducts an inquiry into the bona fides of the marriage. Two wedding anniversaries must pass before the contingent status is upgraded—after a second determination that the marriage is bona fide—to 'permanent' permanent resident status. 8 U.S.C. Section 1186a(c)(3)(B). During the two year probationary period, the alien spouse may remain in the United States.[4]

Conversely, section 5 of the IFMA creates the presumption of invalidity for any marriage entered into by an alien engaged in deportation proceedings. For two years the alien spouse must remain outside the United States before the citizen spouse can petition the INS for an adjustment in the non-resident's status. *Id.* Section 1154(h). The INS does not conduct inquiry into the validity of such marriages until the non-residency period has elapsed.

## II.

◼ To a great extent, resolution of the constitutional aspects of this case turns on the standard of review to which section 5 is subjected. The parties draw their most formidable battle lines around this issue.[5] The plaintiffs argue that section 5 impinges on a fundamental right—the right to marry—and should thus undergo strict scrutiny to determine whether it has been carefully tailored to achieve important governmental interests. There is no denying that section 5 places a harsh burden on the marriages falling within its scope. While true that the legislation does not restrict the citizen spouse from joining the alien spouse in foreign residency, in many instances the married couple may be forced to live apart for the two year interval. There seems something Orwellian about a litmus test that in effect requires a married couple to authenticate their marriage by residing in separate locales. According to the plaintiffs,

the purpose of [s]ection 5 is to create a two-year trial-by-ordeal that will ferret out fraudulent marriages and deny admission to those aliens who cannot survive this 'test.' Only a couple that can survive two years of separation or exile will be permitted to immigrate. Any marriage that disintegrates under the

the courtship is brief and the wedding starkly simple; where the couple does not combine bank accounts or other investments; where the wife retains her maiden name; and where there are discrepancies in answers to questions about which a husband and wife should have common knowledge.
J. Patterson, G. Palmer & E. Brandes, *IRCA, IMFA, and SDCEA: What Does This Immigration Alphabet Soup Spell?*, 39 Baylor L.Rev. 413, 456–57 (1987) ("*IRCA, IMFA, and SDCEA*").

**4.** To remove the "conditional" label from the permanent resident status, the alien and citizen spouses must jointly petition for removal during the 90–day period preceding the second anniversary of the conditional status. 8 U.S.C. Sections 1186a(c)(1)(A) & (d)(2)(A). The petition must state that (1) the marriage was formed in accordance with the laws of the place where the marriage took place; (2) has not been judicially terminated or annulled (other than by the death of a spouse); (3) was not entered into to procure an alien's entry as an immigrant; and (4) no fee was given for the filing of the petition, other than for the assistance of an attorney in preparing the document. *Id.* Section 1186a(d)(1)(A)(i) & (ii). After filing of the peti-

tion, both spouses must appear for a personal interview with an INS official. *Id.* Section 1186a(c)(1)(B). Within 90 days after the interview, the Attorney General must determine whether the alien spouse's conditional status will be lifted. *Id.* Section 1186a(c)(3)(A).

**5.** In considering the constitutional issues raised by the cross-motions, the court also had the benefit of briefs filed by *amici curiae*. Professor Peter H. Schuck of the Yale Law School represented a group of organizations arguing in support of the plaintiffs: the American Council for Nationalities Service (New York, New York); the Catholic Charities, Migration and Refugee Services (Hartford, Connecticut); the Hebrew Immigrant Aid Society (New York, New York); the Lutheran Immigration and Refugee Service (New York, New York); the Presiding Bishop's Fund for World Relief (New York, New York); Congressman Bruce Morrison (D–Connecticut); and Congressman John Rowland (R–Connecticut). Professor Schuck also argued on behalf of these *amici* at the hearing on the defendant's motion for summary judgment. The Immigration Reform Law Institute, a Washington, D.C. organization, filed an *amicus* brief supporting the government's position.

burden of the law's cruel choice will be deemed never to have existed.

Plaintiffs' Memorandum in Response to Defendant's Third Set of Supplemental Authorities at 8.

The government does not dispute that the decision to marry is recognized as a fundamental right protected by our Constitution, *see Zablocki v. Redhail,* 434 U.S. 374, 383–84, 98 S.Ct. 673, 679, 54 L.Ed.2d 618 (1978); *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967), but it contends that judicial review of immigration legislation may proceed only within a narrowly drawn field of inquiry. Congress has traditionally retained broad authority over immigration and naturalization matters. The power to expel or exclude aliens is recognized as a "fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy v. Mezei,* 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953). Moreover, when flexing its powers in matters involving aliens, "Congress regularly makes rules that would be unacceptable if applied to citizens. The exclusion of aliens and the reservation of the power to deport have no permissible counterpart in the Federal Government's power to regulate the conduct of its own citizenry." *Mathews v. Diaz,* 426 U.S. 67, 79–80, 96 S.Ct. 1883, 1891, 48 L.Ed.2d 478 (1976). According to the government, section 5 can be reviewed only in the light cast by the rational basis test; a court is limited to deciding whether the legislation is supported by "a facially legitimate and bona fide reason." *Kleindienst v. Mandel,* 408 U.S. 753, 770, 92 S.Ct. 2576, 2585, 33 L.Ed.2d 683 (1972).

The government relies to a great degree on *Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), where the Court upheld immigration statutes denying immediate relative status to illegitimate alien children whose natural fathers are American citizens but granting special preference to similarly situated children whose natural mothers are American citizens. *Id.* at 799–800, 97 S.Ct. at 1481–1482 (citing 8 U.S.C. Sections 1101(b)(1)(D) & (b)(2)). The plaintiffs—three sets of unwed natural fathers and their illegitimate offspring—brought first, fifth, and ninth amendment challenges to the statutes, arguing that the provisions (1) denied them equal protection by creating a discriminatory classification grounded on the father's marital status, the sex of the parent, and the illegitimacy of the child; (2) denied them due process because there was established the irrebutable presumption that strong psychological and economic ties do not exist between natural fathers and their illegitimate children; and (3) infringed upon the plaintiffs' rights to mutual association and privacy. 430 U.S. at 791, 97 S.Ct. at 1477. The plaintiffs urged strict scrutiny of the statutes. The equal protection, due process, and familial rights challenges in *Fiallo* are essentially the same as those raised in the instant proceeding.

The *Fiallo* Court began its analysis by stressing the narrow parameters within which it could review immigration legislation. "This Court has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Id.* at 792, 97 S.Ct. at 1477 (quoting *Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909)). The Court concluded that the statutes would be reviewed under no more an exacting standard than was employed in *Kleindienst*—itself a first amendment case. 430 U.S. at 795, 97 S.Ct. at 1479. In upholding the statutes, the *Fiallo* Court found that they were supported by facially legitimate and bona fide reasons: "Congress ... has determined that preferential status is not warranted for illegitimate children and their natural fathers, perhaps because of a perceived absence in most cases of close family ties as well as a concern with the serious problems of proof that usually lurk in paternity determinations." *Id.* at 799, 97 S.Ct. at 1481 (citation omitted). The Court recognized that the statutes may deny immediate relative status to fathers and children who share strong family bonds but that the legislative distinctions were "policy questions entrusted exclusively to the political

branches of our Government ... [W]e have no judicial authority to substitute our political judgment for that of the Congress." *Id.* at 798, 97 S.Ct. at 1481.

The plaintiffs attempt to distinguish *Fiallo* as an exclusion, rather than a deportation, case. There, the aliens seeking immediate relative status had not yet entered the United States and thus, according to the plaintiffs, were entitled to less constitutional protection than an alien such as Mr. Azizi who has successfully transversed the borders of the United States. The plaintiffs also view *Fiallo* as involving the creation of substantive immigration classifications based on sex and illegitimacy. Section 5, they argue, is not about such line drawing but about an unconstitutional procedure based on the conclusive presumption that all alien/citizen marriages entered into after the start of deportation or exclusion proceedings are fraudulent. To the plaintiffs' way of thinking, resolution of their constitutional challenges should be controlled by *Landon v. Plascencia*, 459 U.S. 21, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982), rather than by *Fiallo.*

The plaintiff in *Plascencia* was a permanent resident alien who had briefly travelled into Mexico and on her return was apprehended at the border for aiding in an attempt to smuggle aliens into the United States. *Id.* at 23, 103 S.Ct. at 324. The plaintiff argued that as a permanent resident she was entitled to have the issue of admissibility into the United States heard in a deportation proceeding, where she would be entitled to more procedural safeguards and substantive rights than in an exclusion proceeding. *Id.* at 27, 103 S.Ct. at 326. After review of the specific statute under question, the Court concluded that the plaintiff was not entitled to a deportation hearing—as a matter of statutory interpretation—but that she should be afforded due process during her exclusion hearing. "[O]nce an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly." *Id.* at 32, 103 S.Ct. at 329. Because continuously present resident aliens are entitled

to a fair hearing when faced with deportation, the Court found that resident aliens returning from brief absences abroad are also entitled to due process. *Id.* at 32–34, 103 S.Ct. at 329–330. Because the record before it was not fully developed, however, the Court declined to quantify the process due. *Id.* at 37, 103 S.Ct. at 331–332.

Contrary to the plaintiffs' reading of *Plascencia*, the case does not support the proposition that judicial inquiry into congressional policy decisions in immigration matters is heightened because the aliens are deportable rather than excludable. *See Smith v. INS*, 684 F.Supp. 1113, 1117 (D.Mass.1988). The holding is limited to whether a permanent resident is entitled to due process during an exclusion hearing. The *Plascencia* Court makes clear that the judicial role in reviewing the constitutional sufficiency of immigration procedures "is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy." 459 U.S. at 34–35, 103 S.Ct. at 330–331. In short, the court finds nothing in *Plascencia* that reduces the deference due Congress in immigration matters.

Though the plaintiffs make a spirited effort at diluting the precedential force of *Fiallo*, the case is clearly instructive on the level of scrutiny a court must employ when reviewing congressional policy choices in the immigration area. The second circuit has also recognized that a heightened standard of review is inappropriate when analyzing constitutional challenges to immigration provisions. "The power of Congress to regulate the admission and expulsion of aliens is plenary and, absent patent abuse, not subject to judicial scrutiny." *Guan Chow Tok v. INS*, 538 F.2d 36, 38 (2d Cir.1976) (citing *Kleindienst*). The court concludes that the rational basis standard sets the parameters within which section 5 must be analyzed.

■ Prepared for the contingency that the court might reject a strict scrutiny standard, the plaintiffs stake most of their fortunes on a 1976 case from this circuit, a

case that has been addressed by only one of the other courts which have reviewed the constitutionality of section 5 of the IMFA. *See Anetekhai v. INS*, 876 F.2d 1218, 1224 (5th Cir.1989). The second circuit case, *Francis v. INS*, 532 F.2d 268 (2d Cir.1976), deserves a hard look because the court of appeals struck down an immigration statute using a rational basis inquiry. The plaintiff, a permanent resident alien, was convicted of a drug offense some ten years after lawfully entering the United States from Jamaica. By reason of the drug conviction, the INS began deportation proceedings against him. *Id.* at 269. In 1974 the Board of Immigration Appeals ("Board") entered a final order of deportation, from which he sought review by the court of appeals, arguing that he was entitled, under the INA, 8 U.S.C. Section 1182(c), to apply to the Attorney General for that official's permission to remain in the United States. 532 F.2d at 270.[6] The court summarized the Board's view of the Attorney General's discretionary power thusly:

> Under present Board interpretations, a lawfully admitted alien, convicted of a narcotics offense, who departs from and returns to the United States to an unrelinquished domicile of seven years may be permitted to remain in this country in the Attorney General's discretion. On the other hand, the Attorney General is without discretion to allow petitioner, a lawfully admitted alien convicted of a narcotics offense, to remain in the United States despite an unrelinquished domicile of more than seven years solely because he has never made a temporary departure from this country since the time of his conviction.

*Id.* at 269. The plaintiff argued that the distinction drawn in the statute between aliens who travel abroad after conviction and those who do not "lacks any basis rationally related to a legitimate governmental interest, and therefore, deprives

him of the equal protection of the law." *Id.*

The *Francis* court began its analysis by reviewing the changing interpretations the statute at issue had undergone through the years, until the Board came to view the statute as meaning that Congress had intended actual departure from and return to the United States. *Id.* at 270–72. Citing the *Kleindienst* case, the *Francis* court recognized that "[t]he authority of Congress and the executive branch to regulate the admission and retention of aliens is virtually unrestricted," but that in enforcing immigration laws " 'the [e]xecutive [b]ranch of the [g]overnment must respect the procedural safeguards of due process.' " *Id.* at 272 (quoting *Galvan v. Press*, 347 U.S. 522, 531, 74 S.Ct. 737, 742–743, 98 L.Ed. 911 (1954)). The second circuit also reaffirmed "the applicability of the equal protection guarantee to deportation proceedings, 532 F.2d at 272 (citing *Noel v. Chapman*, 508 F.2d 1023, 1026–29 (2d Cir.), *cert. denied*, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975)), but concluded that the right of a permanent resident alien to remain in the United States was not a fundamental right requiring strict scrutiny. 532 F.2d at 272.

As the appropriate level of inquiry, the *Francis* court adopted the minimal scrutiny test, under which "distinctions between different classes of persons 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' " *Id.* (quoting *Stanton v. Stanton*, 421 U.S. 7, 14, 95 S.Ct. 1373, 1377, 43 L.Ed.2d 688 (1975) (quoting *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561–562, 64 L.Ed. 989 (1920))). In holding that the departure statute could not survive even minimal scrutiny, the court found that the government had not identified "any reason" why failure to travel abroad after a conviction should bar an alien from peti-

---

**6.** The statute provides in relevant part: "Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General...." 8 U.S.C. Section 1182(c).

tioning the Attorney General for permission to remain in the United States. 532 F.2d at 273. "Reason and fairness would suggest that an alien whose ties with this country are so strong that he has never departed after his initial entry should receive at least as much consideration as an individual who may leave and return from time to time." *Id.* Because the departure-and-return feature of the statute was an "irrelevant and fortuitous factor[ ]," the *Francis* court found the Board's interpretation of the statute to be unconstitutional as applied to the plaintiff. *Id.*

Though *Francis* predated *Fiallo*, the plaintiffs stress that the second circuit case has been explicitly approved by post-*Fiallo* courts. *See, e.g., Variamparambil v. INS,* 831 F.2d 1362, 1364 n. 1 (7th Cir.1987); *Newton v. INS,* 736 F.2d 336, 340 (6th Cir.1984); *Lok v. INS,* 681 F.2d 107, 108 n. 2 (2d Cir.1982); *Tapia–Acuna v. INS,* 640 F.2d 223, 224–25 (9th Cir.1981). They also emphasize that *Francis,* as well as *Fiallo,* relied on *Kleindienst* for application of the rational basis standard of review. According to the Azizis the constitutional defect in the statute in *Francis* is precisely analogous to the one purportedly present in section 5 of the IMFA. The plaintiffs set forth a series of arguments for why section 5 bears no rational relationship to proving the validity of an alien/citizen marriage.

First, the plaintiffs characterize section 5 of the IMFA as a trap for the unwary. They point to several ways resourceful individuals can circumvent the two-year foreign residence requirement. According to the plaintiffs, the INS has adopted the position that a married couple subject to the penalties of section 5 could evade the provision's strictures if the alien spouse voluntarily leaves the country before the conclu-

sion of deportation hearings, the couple obtains a divorce, and the couple then remarries. "The alien spouse would thereupon be eligible for immediate re-entry pursuant to the second marriage to the same spouse." Plaintiffs' Submission of Supplemental Authorities in Support of Cross–Motion for Summary Judgment at 2 (relying on correspondence of James A. Puleo, INS Assistant Commissioner for Adjudications).[7] This policy, the Azizis argue,

> underscores that [s]ection 5 is not rationally related to a legitimate governmental purpose. The ability of a couple to travel abroad, divorce, remarry and return does not bear any rational relationship to whether the initial marriage is *bona fide.* The willingness or ability to undergo a 'paper' divorce and remarriage will depend upon a couple's religious beliefs, financial resources and the vagaries of state and foreign laws regulating divorce. In addition, the very factors that show a marriage's validity and a couple's sincerity, such as the existence of children or reluctance to undertake legalistic transactions solely to conform to the immigration laws, would mitigate against taking advantage of the 'divorce-and-re-marry' policy.

*Id.* at 2–3. The plaintiffs also cite a second INS policy: An alien in deportation proceedings who voluntarily departs the country before marrying the American citizen may expeditiously return on a fiancee "K" visa if the consular officer is satisfied that the alien is otherwise admissible and that the couple intends to marry within 90 days of the alien's re-entry into the United States. *Id.* at 3 (relying on correspondence of Lawrence J. Weinig, INS Deputy Assistant Commissioner for Adjudications).[8] The plaintiffs also contend—without attribu-

---

7. Mr. Puleo notes two caveats, however. First, a person who departs from the United States while under an order of deportation becomes excludable under the INA and requires permission to reapply after departure. Second, a new petition based on the second marriage will be approved only if the marriage is bona fide.

8. Another variation on this theme has been identified. An alien intending to marry an American citizen

need merely await the conclusion of the deportation or exclusion proceedings, leave the United States to marry, and then gain immigration benefits. Granted, the alien must take a short vacation, but can confidently return prior to issuance of a visa as the INA excuses unauthorized employment and lack of status for an immediate relative.

*IRCA, IMFA, and SDCEA, supra* note 3 at 463.

tion—that even if Mr. Azizi were to have left the United States and then returned illegally, he could have married Mrs. Azizi without exposure to the two-year penalty.

Second, the plaintiffs argue that section 5 is irrational because it makes it harder rather than easier for the government to detect sham marriages. As noted earlier, section 2 of the IMFA applies when the alien marries an American citizen before deportation or exclusion proceedings commence. A section 2 marriage receives two inquiries into its bona fides, once when "conditional" status is considered shortly after the marriage, and again when that status is reconsidered for removal after the two-year period in the country. A section 5 marriage receives one searching review only—at the conclusion of the overseas residency. According to the plaintiffs, this incongruous difference in procedure "undermines the most potent weapon for preventing marriage fraud"—the INS investigative procedure. Plaintiffs' Memorandum in Response to Defendant's Third Set of Supplemental Authorities at 5. Because many section 5 couples will not have lived together during the proving period, the plaintiffs argue, "few of the normal objective indicia of a valid marriage will be present," and the reliability of the INS inquiry will consequently be diminished. *Id.*

Not surprisingly, the government disputes the plaintiffs' analysis and conclusions. As to the persuasiveness of the INS correspondence used to support the plaintiffs' loophole argument, the defendant contends that such policy statements lack the prescriptive force of INS regulations. Moreover, even if there are loopholes in section 5, according to the defendant, these defects do not necessarily lead to the conclusion that the statute is unconstitutional. In analyzing section 5 under the rational basis test, "[t]he question is not whether the statute performs the purpose perfectly well. '[T]he reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.... The legislature may select one phase of one field and apply a remedy there, neglecting the others.'"

Defendant's Response to Plaintiffs' Application for Leave to Submit Supplemental Authorities in Support of Plaintiffs' Cross–Motion for Summary Judgment and to Plaintiffs' Submission of Supplemental Authorities in Support of Cross–Motion for Summary Judgment at 2 (quoting *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955)).

Despite the plaintiffs' ingenious and herculean efforts at undermining the constitutionality of section 5, the court is compelled, under the rational basis test, to uphold the validity of the statute. Though section 5 appears to have been crafted with a cudgel rather than a scalpel—by the government's own figure of 30% sham marriages, seven marriages out of ten are penalized though valid—it is not difficult to identify a facially legitimate and bona fide reason for this particular exercise of congressional power. Congress could rationally have concluded that the two-year exile of aliens who marry American citizens while in deportation or exclusion proceedings would deter, even to a numerically small degree, aliens contemplating fraudulent marriage under such circumstances. Moreover, the Court has recognized that line drawing among categories of individuals is not an exact science: "[A]ny line must produce some harsh and apparently arbitrary consequences...." *Mathews,* 426 U.S. at 83, 96 S.Ct. at 1893. In enacting section 5, Congress chose to treat differently alien/citizen marriages that take place after deportation or exclusion hearings have been initiated. In selecting the timing of the marriage as the criterion for the classifications, Congress could reasonably have believed that marriage fraud is more prevalent among aliens facing deportation or exclusion.

In many instances, these aliens will have no valid defense to deportation and marriage to an American citizen may be their only hope for remaining in this country. The amendments are designed to deter marriage fraud in this susceptible group by removing the incentive to engage in a fraudulent marriage. Since marriage to

a United States citizen will no longer allow an alien engaged in deportation proceedings to remain in this country, it is rational to conclude that the two year non-residency requirement will have *some* effect in reducing the incidence of marriage fraud within this high-risk group.

*Smith,* 684 F.Supp. at 1117 (emphasis added). The legislative history behind the IMFA is replete with congressional concern about the problem of immigration marriage fraud and about the difficulty of uncovering it.

*Francis* is not inapposite to this conclusion. There, the government could offer no reason why the departure-and-return requirement of the statute "should be a crucial factor in determining whether [the plaintiff] may be permitted to remain in this country." 532 F.2d at 273. The court recognized "the power of the Congress to create different standards of admission and deportation for different groups of aliens," but required that once such classifications are constructed, "individuals within a particular group may not be subjected to disparate treatment on criteria *wholly unrelated* to any legitimate governmental interest." *Id.* (emphasis added). Unlike the statute at issue in *Francis,* section 5 is grounded on the plausible nexus between marriage fraud and deportation or exclusion proceedings.

■ In addition to their equal protection challenge, the plaintiffs contend that section 5 violates their due process rights. They argue that the procedure used for establishing the validity of section 2 marriages should also be available to them. It is beyond argument that procedural due process adheres only if the asserted interest is encompassed within the meaning of life, liberty, or property, as derived from the Constitution or as created by federal or state law. *Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Section 5 grants no interest that triggers due process; rather, it "specifically denies the immigration benefits that the plaintiffs seek to acquire." *Smith,* 684 F.Supp. at 1118. Furthermore,

though the plaintiffs contend otherwise, the constitutionally-protected right to marry does not include a citizen spouse's interest in having the alien spouse remain in the United States. *See, e.g., Burrafato v. United States Dept. of State,* 523 F.2d 554, 555 (2d Cir.1975) (the deportation of an alien spouse does not infringe on any constitutional right of the citizen spouse), *cert. denied,* 424 U.S. 910 (1976). *See also Noel,* 508 F.2d at 1027–28. In short, though section 5 imposes a harsh burden on the plaintiffs' marriage, the only procedural due process to which they are entitled was whether Mr. Azizi married after deportation proceedings had begun against him and whether the marriage took place after section 5 became applicable. These facts are not in dispute.

■ Notwithstanding the plaintiffs' argument that section 5 is unconstitutional because it creates the irrebutable presumption that their marriage is a sham, the statute does not implicate any substantive due process rights. Though the plaintiffs argue that the government may not make a conclusive presumption that burdens fundamental rights without an opportunity to rebut the presumption, *see, e.g., Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 651, 94 S.Ct. 791, 801, 39 L.Ed.2d 52 (1974) (court invalidated maternity leave regulation that conclusively presumed women not fit to teach when more than five months pregnant), section 5 passes muster under the deferential standard of review courts must employ in immigration matters. In many respects the facts in *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), are analogous to those in the instant matter. *Weinberger* involved a challenge by a widow and her stepchild to a Social Security Act provision precluding the plaintiffs from receiving insurance benefits unless their relationships to the decedent wage earner had existed at least nine months before his death. Though the statute in question had the effect of excluding some legitimate claimants and including some fraudulent claimants, the Court found that the duration-of-relationship requirement reflected a proper

congressional concern for the integrity of the Social Security system and the marriage relationship.

> It is ... undoubtedly true that the duration-of-relationship requirement operates to lessen the likelihood of abuse through sham relationships entered in countemplation of imminent death. We also think that Congress could rationally have concluded that any imprecision from which it might suffer was justified by its ease and certainty of operation.

*Id.* at 780, 95 S.Ct. at 2474. As noted earlier, Congress in implementing section 5 of the IMFA could rationally have concluded that a blanket rule on alien/citizen marriages entered into after deportation or exclusion proceedings had begun would limit the occurrence of marriage fraud. While it can be argued that individual determinations into the bona fides of such marriages would require only a minimal degree of expense and effort, Congress possesses the inherent power to omit such a procedure from an immigration statute.

The court concludes that section 5 survives constitutional scrutiny.[9] Though the provision is undeniably harsh,[10] the judiciary's role in ameliorating its effects is necessarily constrained. As stated previously, the plaintiffs' avenue of redress lies with the political departments of our government. At least one Congressional proponent of the IMFA has expressed second thoughts about the broad and imprecise sweep of section 5 and has recommended repeal of the statute.[11]

---

**9.** The plaintiffs contend that there are genuine issues of material fact that preclude entry of summary judgment on the constitutionality issue. The court disagrees. The only material facts necessary to resolve this issue are not in dispute: Mr. Azizi, an alien, married Mrs. Azizi, an American citizen, after Mr. Azizi was placed in deportation hearings. The marriage took place after the effective date of section 5, and Mr. Azizi has not lived abroad for two years following the marriage.

**10.** Professor Schuck, *see supra* note 5, wastes no words in his assessment of section 5, regarding it "remarkabl[y] intrusive[ ]," "drastically over-inclusive," "absurdly under-inclusive," and "probably ... the most cruelly Procrustean, irrebutable presumption in the entire United States Code." Brief of Amici Curiae in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment at 5.

**11.** The IMFA was passed during the waning hours of the 99th Congress. It was sponsored in the Senate by what some might consider an unlikely trio: Sen. Strom Thurmond (R–South Carolina); Sen. Edward Kennedy (D–Massachusetts); and Sen. Paul Simon (D–Illinois). After enactment of the statute, Senator Simon commented on the "unintended consequences" of the IMFA;

> When we passed the [IMFA] we did so in order to deter what was a serious problem—abuse of our immigration laws by citizens and aliens to illegally secure residency rights via a fraudulent marriage.
>
> ....
>
> However, in trying to ferret out those who abuse our marriage-related immigration laws, recent news indicates we may have gone too far and are now infringing on the rights of those U.S. citizens and alien spouses who marry out of true love and respect for each other. Section 5 of the new law gives no opportunity for those who enter into bona fide marriages to demonstrate the validity of that marriage if the alien spouse was subject to deportation and married after November 10, 1986.
>
> *It appears now that the operation of Section 5,* which requires that an alien who married subject to deportation must leave the country for two years, *goes too far and infringes on the privacy and futures of married couples we had no intention of affecting.* The cases I have heard about in Illinois, Connecticut, Oklahoma and here in the District of Columbia strongly suggest that we take another look at this law. I believe that we can seriously address the problems of marriages entered into to get around our immigration laws without requiring all spouses who were subject to deportation at the time of the marriage to leave the United States for two years. I believe it is sufficient for newly married aliens to be granted conditional residency for two years and then to return later for review by immigration officials for their permanent resident status.
>
> Repealing Section 5 does not take away from the central thrust of the law—to remove the incentive for fraud by delaying the residency benefit from marriage for two years. The I.N.S. can still ascertain the bona fide nature of the marriage but aliens who do marry will not be forced to return to their home country divided from their American spouse. Similarly, the American citizen should not be placed in the situation of having to choose between his or her country, career and other family on the one hand and moving away to a foreign land where he or she may not know the language and customs or be able to work for a two year period on the other in order to live with the new spouse.

### III.

The plaintiffs also argue that the government should be equitably estopped from applying section 5 to them because of misconduct on the part of the INS.[12] On January 14, 1987, about two weeks after the plaintiffs' marriage, an immigration judge in Chicago denied Mr. Azizi's application for political asylum but granted his request for voluntary departure from the United States.[13] The judge permitted Mr. Azizi until July of that year to leave the country. According to the plaintiffs, the judge informally advised Mrs. Azizi to file a petition to classify her husband as an immediate relative spouse. Mrs. Azizi filed such a petition with the INS office in Hartford, Connecticut on January 15, 1987. The INS accepted the petition despite the fact that the IMFA had become effective some two months earlier.

Approximately one week after the petition was filed, the deadline lapsed on the filing of an appeal from the denial of political asylum. Relying on the advice of the immigration judge, and being unaware of the IMFA, Mr. Azizi chose not to appeal the denial of asylum. The INS approved the immigrant visa petition on June 23, 1987. With the visa in hand, Mr. Azizi believed that it was not necessary for him to depart in July. On July 2, 1987, however, the INS issued a warrant of deportation for Mr. Azizi; he was taken into custody on November 16, 1987. He then filed motions to stay deportation and to reopen his deportation proceedings. A stay of deportation was granted until a determination could be made on the motion to reopen. On November 27, 1987 an immigration judge denied the motion to reopen. Three days later Mr. Azizi was released on bond. The plaintiffs filed this lawsuit on December 9, 1987. The next day an immigration judge revoked the visa petition which had been issued the previous June, claiming that the petition had been mistakenly granted in disregard of section 5.

According to the plaintiffs, they relied to their detriment on misrepresentations made by INS officials and on the June 23, 1987 issuance of the immigrant visa. "Based on the government's conduct, plaintiffs' reliance thereon, and the manifest injustice of this case, the government should be estopped from denying or revoking plaintiffs' immigrant visa petition." Fourth Amended Complaint, para. 36.

The government counters the estoppel claim with two arguments. It first contends that this court lacks jurisdiction to decide the claim because Mr. Azizi has not

---

I have been informed by our Immigration Subcommittee Chairman Senator Kennedy that he, too, is interested in legislation to ameliorate the effects of this law on couples in bona fide marriages we did not intend to send away....

Appendix to Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment, Exhibit D (statement of Sen. Paul Simon on the IMFA) (emphases added).

12. The equitable claim was not set forth in the complaint or in the three amended versions of the complaint that had been filed before oral argument on the defendant's motion for summary judgment. The issue had been briefed by the parties, however. At the hearing, counsel for the government first raised the pleading deficiency. The court heard oral argument on the matter and instructed the plaintiffs to file a post-hearing request to amend the complaint. In their request, the plaintiffs make the argument that the defendant would not be prejudiced by the late addition of the estoppel claim because the parties had already addressed the issue in their submissions on the government's Rule 56 motion. The defendant opposed the filing of the proposed amendment on various grounds. At oral argument the court also granted the plaintiffs leave to file a cross-motion for summary judgment; the plaintiffs represented that they would rely on the memorandum that had already been filed in opposition to the defendant's summary judgment motion.

The court will permit the filing of the latest amended complaint. Because the court finds for the government on the estoppel argument, no prejudice inures to the defendant by allowing the amendment. Moreover, the parties have intimated in the past that an appeal would likely be taken no matter which way the court rules on the cross-motions. By allowing the amendment, and by resolving the estoppel issue, a complete record is created for any appellate action the parties contemplate.

13. The court draws these facts from the plaintiffs' fourth amended complaint and their memoranda of law. Assuming for the sake of argument that the facts are undisputed, they do not give rise to material issues of fact that would preclude the entry of summary judgment in favor of the defendant.

exhausted the administrative remedies available to him.

The regulations at 8 C.F.R. [Sections] 103.5 and 242.22 permit him to file a motion to reopen to the immigration judge, wherein he can raise the misrepresentation issue and thereby seek to present anew his asylum claim at a reopened hearing. If the motion to reopen for such purpose should be denied, such order is administratively appealable to the Board of Immigration Appeals. Should the Board also deny the motion to reopen, its order is reviewable in the court of appeals upon the filing of a petition for review under section 106 of the [INA].

Defendant's Opposition to Plaintiffs' Request for Leave to Amend Complaint at 3 (citing *Giova v. Rosenberg*, 379 U.S. 18, 85 S.Ct. 156, 13 L.Ed.2d 90 (1964) (*per curiam*); *Variamparambil*, 831 F.2d at 1364–65)). *See also* 8 U.S.C. Section 1105a (section 106 of the INA). Moreover, even if such remedies were exhausted, the government argues, all final orders of deportation—except habeas proceedings for detained aliens—are reviewable in the first instance by the courts of appeal.

■ The government's argument carries a persuasive force that is not convincingly rebutted by the plaintiffs. But even if the court were to find that it possesses subject matter jurisdiction over the plaintiffs' estoppel claim, the government's second argument would carry the day. Before the government can be estopped there must be proof, at a minimum, of affirmative misconduct on the part of government officials. *INS v. Miranda*, 459 U.S. 14, 19, 103 S.Ct. 281, 283, 74 L.Ed.2d 12 (1982) (*per curiam*). Negligent conduct is an insufficient basis for an estoppel claim. *Id.* at 18, 103 S.Ct. at 283; *see also Mukherjee v. INS*, 793 F.2d 1006, 1009 (9th Cir.1986). The plaintiffs allege that "misrepresentations" by the immigration judge prompted Mrs. Azizi's filing of an immediate relative petition on her husband's behalf. Fourth Amended Complaint, para. 12. Moreover, Mr. Azizi did not voluntarily depart from the United States because he "[r]el[ied] upon his approved immigrant visa petition

and representations made by officers of the Hartford office of the INS...." *Id.*, para. 15. At the most, these allegations might demonstrate negligence on the part of INS officials, but not the level of serious misconduct that is needed to underpin an estoppel claim. Beyond these allegations there is nothing in the record that would indicate the presence of a genuine issue of material fact as to the estoppel claim.

### Conclusion

For the foregoing reasons, the court grants the plaintiffs' request to file their "Fourth Amended Complaint." The court also grants the defendant's motion for summary judgment and denies the plaintiffs' cross-motion. The Clerk of the Court is directed to enter summary judgment, pursuant to Rule 56, Fed.R.Civ.P., in favor of the Attorney General.

SO ORDERED.